631 F.2d 1353
 15 ERC 1656
 NATIONAL PORK PRODUCERS COUNCIL, an Iowa Corporation;
Charles Grassley; Tom Hagedorn; and Steven Symms;
and National Independent Meat Packers
Association, Appellees,
v.
Bob BERGLAND, Secretary of Agriculture; Carol Tucker
Foreman, Assistant Secretary of Agriculture for Food and
Consumer Services; and Donald Houston, Acting Administrator,
Food Safety and Quality Service, United States Department of
Agriculture, Appellants.
 No. 80-1229.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1980.
Decided Sept. 23, 1980.
 
 Alice Daniel, Asst. Atty. Gen., Eloise E. Davies, Susan M. Chalker, Attys., Civ. Div., Dept. of Justice, Washington, D. C., for Bob Bergland et al.
 Edwin H. Pewett, James M. Kefauver, James B. Davis, Glassie, Pewett, Beebe & Shanks, Washington, D. C., for National Meat Ass'n.
 James L. Fox, Donald P. Colleton, Abramson & Fox, Chicago, Ill., for National Pork Producers.
 Before HEANEY and BRIGHT, Circuit Judges, and HUNGATE, District Judge.*
 HEANEY, Circuit Judge.
 
 
 1
 This appeal presents the question of whether the United States Department of Agriculture (USDA) properly exercised its authority when it issued regulations permitting nitrate and nitrite-free meat products to be sold under product names traditionally reserved for foods containing these compounds. The district court held that it did not. We reverse.
 
 
 2
 * The history of nitrate and nitrite use in curing meat and poultry products is a long one. As early as Homer's time (900 B.C.), curing meat with salt was an established practice. Although it surely was not known at the time, the desert salts used in the curing process contained nitrate impurities, which caused cured meat to develop a characteristic spicy flavor and pink color. In addition, the curing process helped preserve the meat from bacterial spoilage. The cure was particularly effective, it is now known, in inhibiting the growth of Clostridium botulinum, the bacteria that produce the deadly toxin responsible for the food poisoning known as botulism.
 
 
 3
 Although curing is a centuries-old practice, it was not until the first part of the twentieth century that scientists identified the active agent responsible for the cure. The color, flavor and preservative effects were caused by the meat's reaction with nitric oxide, which was formed from nitrite, which was, in turn, formed from the nitrate used in the curing process. Because these reactions are difficult to control when meat products are cured with nitrate, the USDA formally authorized the direct addition of nitrite in 1925. In some products, such as bacon, some form of nitrite is required by USDA regulations. See 9 C.F.R. § 318.7(b) (1980). Because nitrite was recognized as potentially toxic, however, a maximum residual amount of 200 parts per million was established. Nitrate was not directly regulated.
 
 
 4
 In the late 1960's, concern developed over nitrite use as studies suggested that nitrites combined with other compounds in the food or in the body to form nitrosamines, which were known to be potent carcinogens in animals. As one report presented to a Senate Committee indicates, the possibility that nitrites could cause cancer touched off a flurry of activity:
 
 
 5
 In October 1969, meat industry scientists met with the Assistant Secretary of Agriculture to discuss the possibility of a nitrosamine problem existing in U.S. cured meat products. In December of 1969, a group of USDA, FDA, and industry scientists met to discuss the problem, resulting in the scheduling of a cooperative research program to be funded by industry and actively participated in by industry, FDA, and the Department. The Food and Drug Administration (FDA) and the U.S. Department of Agriculture organized a scientific study group to review appropriate information and data. In 1971, the House Intergovernmental Relations Subcommittee conducted hearings on the issue of nitrosamine formation and the possible involvement of nitrite in cured foods. The matter was widely discussed by the public and the media, and further studies were carried out by the scientific community. Numerous conferences were held during 1972, to discuss available information on the role of nitrite in curing and preserving, and to determine what new information was needed.
 
 
 6
 Because of the widespread interest in the subject, the Secretary appointed an Expert Panel in 1973 to assess the data concerning the presence of nitrosamines in foods, to evaluate the public health significance and specific problems identified with the use of nitrites in foods, and to determine if alternate methods of processing were available.
 
 
 7
 Agriculture, Rural Development, and Related Agencies Appropriations for Fiscal Year 1979: Hearings before a Subcomm. of the Senate Comm. on Appropriations, 95th Cong., 2d Sess. 2936, 2937 (1978) (Final Report on Nitrites and Nitrosamines to the Secretary of Agriculture by the Expert Panel on Nitrites and Nitrosamines).
 
 
 8
 One conclusion of the new round of studies was that nitrosamines are formed in nitrite-cured bacon when it is fried at high temperatures, particularly if it is cooked until crisp. As a result, in 1978, the USDA promulgated revised regulations that reduced the permissible levels of nitrite in bacon, required that other additives be used to lessen the likelihood that nitrosamines would form, and established procedures for testing bacon to ensure that it contains no confirmable levels of nitrosamines after cooking. 9 C.F.R. § 318.7(b) (1980); see American Meat Inst. v. Bergland, 459 F.Supp. 1308 (D.D.C.1978).
 
 
 9
 Another, more tentative, conclusion of the scientific studies on nitrate and nitrite use was stated in 1978 by Paul Newberne of the Massachusetts Institute of Technology. The Newberne Report determined that nitrites themselves caused cancer in laboratory animals, even if nitrosamines had not formed prior to ingestion. This report prompted a wave of criticism from the meat industry on the one hand, and resulted in increased pressure on the USDA to completely ban the use of nitrites on the other. The Department resisted these pressures, however, finding that greater scientific study was required.[1] See Schuck v. Butz, 500 F.2d 810 (D.C.Cir.1974).
 
 
 10
 As the USDA and FDA studies continued, public awareness of the problem resulted in increased consumer demand for nitrate and nitrite-free products. USDA regulations, however, prohibited the production, sale or distribution of nitrate and nitrite-free products under their traditional names such as frankfurters, bacon, etc. As a result, consumers complained of some difficulty in identifying or finding the products they desired.
 
 
 11
 The Food Safety and Quality Service of the USDA responded to these complaints on April 28, 1978, by publishing a notice of proposed rulemaking in the Federal Register. 43 Fed.Reg. 18,193 (1978). In this notice, the USDA proposed to amend the federal meat inspection regulations to permit the sale of nitrate and nitrite-free products under their traditional names, provided that certain labeling and quality requirements were met.
 
 
 12
 In the sixty-day comment period following notice of the proposed rule, the USDA received 365 comments from individual consumers, consumer organizations, and industry and trade associations. In addition, the USDA consulted the National Advisory Committee on Meat and Poultry Inspection about the proposal and the comments. On June 14, 1979, the USDA issued a Final Impact Statement on the proposed rule, detailing the need for the rule, the options considered, and the expected impact of its implementation. On August 21, 1979, the USDA promulgated the final regulation, to be effective September 20, 1979. See 9 C.F.R. §§ 317.17(b) & (c), 318.7, 319.2.[2] The final rule provides that meat and meat products that are not cured with nitrates, nitrites or other preservatives may be sold under their traditional names, so long as the word "Uncured" appears on the label as part of the product name and the label states: "No Nitrate or Nitrite Added" and "Not Preserved-Keep Refrigerated Below 40o F. At All Times." In addition, the regulation requires that the uncured products be similar in size, flavor, consistency and general appearance to the products commonly prepared with nitrate or nitrite.[3]II
 
 
 13
 On September 20, 1979, the National Pork Producers Council, a trade organization representing approximately 92,500 United States pork producers, together with three members of the United States House of Representatives, filed this lawsuit challenging the regulations. The National Independent Meat Packers Association, a trade association representing approximately 300 meat packers, was subsequently granted leave to intervene as a party plaintiff. The plaintiffs sought declaratory and injunctive relief.
 
 
 14
 On February 12, 1980, the district court entered a final order permanently enjoining the government from enforcing or applying the challenged regulations.[4] The court rested its decision on four grounds:
 
 
 15
 (1) The Secretary of Agriculture acted arbitrarily and capriciously because he failed to consider whether consumers would be subjected to botulism poisoning if they were to handle uncured products in the fashion in which they now handle cured products, and because there was no rational basis in the record for assuming that the required labels would effectively prevent confusion between the two types of products.
 
 
 16
 (2) The Secretary exceeded his authority under the Federal Meat Inspection Act, 21 U.S.C. § 601 et seq., because the regulation was promulgated for the unlawful purpose of promoting or encouraging a market for nitrate and nitrite-free products.
 
 
 17
 (3) The Secretary exceeded his authority because the similarity requirement bore no rational relationship to the purposes of the Federal Meat Inspection Act and because it constituted a subjective standard of identity rather than an objective recipe or formula.
 
 
 18
 (4) The Secretary failed to comply with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., because he neither filed nor considered the need for an Environmental Impact Statement (EIS).[5]III
 
 
 19
 Before discussing in detail the reasoning of the district court, we briefly consider the appropriate standard for reviewing regulations, such as these, promulgated pursuant to the "notice and comment" provision of the Administrative Procedure Act, 5 U.S.C. § 553(c). The standard "is that specified by 5 U.S.C. § 706(2)(A), which authorizes a reviewing court to set aside agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 238 (8th Cir. 1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). Furthermore, "unless an inadequate evidentiary development before the agency can be shown and supplemental information submitted by the agency does not provide an adequate basis for judicial review, the court * * * should limit its inquiry to the administrative record already in existence supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." Id. at 239. The district court explicitly recognized this standard in its opinion, but it nevertheless held a hearing that included the presentation of some evidence beyond "proof of an explanatory nature." We turn now to an independent examination of the record to determine whether the USDA acted arbitrarily, capriciously, or otherwise not in accordance with law.
 
 IV
 
 20
 A. Arbitrary and capricious action.
 
 
 21
 The district court's reasons for holding that the Secretary's action was arbitrary and capricious were that the USDA failed to consider whether consumers would be subjected to botulism poisoning if they were to handle uncured products in the same manner they now handle cured products and whether the labeling requirements would eliminate the risk. We find these rationales unconvincing.
 
 
 22
 First, it is clear from the record that the USDA was very concerned with the possible problem of botulism poisoning. The dangers of botulism and the handling practices necessary to ensure safety were carefully considered by the Secretary. As noted earlier, the USDA and other governmental agencies have been studying the health effects of nitrates and nitrites at least since the 1960's. These agencies have been looking for alternative preservatives and have sought ways to make nitrates and nitrites less dangerous without destroying their ability to control the growth of Clostridium botulinum. When the agency promulgated regulations to reduce the levels of nitrites in bacon, it reduced them only to the lowest level thought necessary to control these bacteria. More importantly, the agency expressly recognized the potential botulism danger in the official documents in this administrative proceeding. The notice of proposed rulemaking stated:
 
 
 23
 The Administrator recognizes that meat products prepared without nitrate and/or nitrite or with reduced levels of nitrate and/or nitrite may better support the growth and toxin production of Clostridium botulinum that (sic) meat products prepared with the traditional levels of nitrate and/or nitrite currently permitted by regulation * * *. Clostridium botulinum intoxication (botulism) is a type of food poisoning which often causes death.
 
 
 24
 43 Fed.Reg. 18,193 (1978).
 
 
 25
 Similarly, the explanation accompanying the final rule reflected the agency's awareness of the dangers of botulism and the value of nitrites in reducing that danger. See 44 Fed.Reg. 48,959 (1979). Indeed, it was this awareness that prompted the strict labeling requirements in the regulations.
 
 
 26
 The agency was not only fully aware of the botulism risk, it considered evidence of the effect of the proposed regulation, particularly the labeling requirements, on that risk. It noted that some of the 365 comments submitted to it "expressed concern whether such labeling provisions would be adequate to protect against botulism with respect to * * * unpreserved products. In this connection, some commentators questioned whether products would always be handled in accordance with the warnings on the labeling and be kept below 40o F." 44 Fed.Reg. 48,959 (1979). Nevertheless, the agency found persuasive evidence that the benefits of the regulation would outweigh any potential safety problem. Many of the comments demonstrated consumer awareness of the potential dangerous consequences of marketing and consuming meat products that do not contain nitrates or nitrites.[6] Many commentators referred to the positive safe experiences they had had with purchasing uncured products in the past. Others stated that their knowledge of food products came from a careful reading of product labels. Still others indicated an understanding of the term "uncured" and expressed a willingness to adhere to the instructions on the label in exchange for an opportunity to buy meat products without nitrates or nitrites. Indeed, even the comment of the plaintiff-congresspersons in this action recognized the efficacy of warning labels; the congresspersons suggested, inter alia, that a revised regulation require strict warning labels.
 
 
 27
 Moreover, not only was the agency aware of the botulism danger at the outset, and not only did it consider further evidence of the danger, once it reviewed the evidence, it took positive steps to eliminate the chance of any danger resulting from the regulations. The final rule differed from the proposed rule in two significant respects. First, the labels on nitrate or nitrite-free products were required to contain the word "Uncured" as part of the product name. The agency described its reasons for the change as follows:
 
 
 28
 (T)he Administrator has determined, based on the comments, that the use of nitrates and nitrites is of such importance in products preserved by these substances, that products prepared without such substances should have different names from those prepared with nitrates or nitrites in order to more clearly distinguish such products. Under these circumstances, it has been determined that such products prepared without nitrates or nitrites may bear the traditional name, but that the traditional name must be preceded by the term "Uncured."
 
 
 29
 44 Fed.Reg. 48,959 (1979).
 
 
 30
 Second, the proposed rule had permitted the sale, under traditional names, of products with low nitrate levels if they were labeled "Not Fully Preserved, Must Be Refrigerated Below 40o F. At All Times." This provision was deleted, partly in response to concern about whether "consumers might misuse such products not otherwise preserved, based on a false assurance that the listing of nitrates or nitrites in the ingredients statement would be understood to represent that products could be handled under the same circumstances acceptable for products fully preserved by nitrates or nitrites." Id. at 48,960. These changes in the regulation are further proof that the agency carefully considered the evidence of botulism risk and made a reasoned determination in response to that evidence.[7]
 
 
 31
 After considering the submitted comments, consulting the Advisory Commission, and reviewing the relevant evidence before it, the agency made the following statement:
 
 
 32
 The Administrator * * * is aware that products requiring such special handling such as pork sausage, bratwurst and bockwurst have presented no apparent health hazards even though prepared without nitrates or nitrites and marketed unfrozen. He concludes that consumers have demonstrated a knowledge of the handling practices necessary for any of such products prepared without nitrates or nitrites and that the prescribed labeling for such products, i. e., "Not Preserved Keep Refrigerated Below 40o F. At All Times," will adequately inform the consumer of how to maintain such products in a wholesome condition until consumed.
 
 
 33
 Id.
 
 
 34
 Although the record contains some evidence that would suggest a different conclusion, we cannot say that the Secretary's determination is without basis in the record. Accordingly, the district court erred in holding that the Secretary acted arbitrarily and capriciously in promulgating these regulations.
 
 
 35
 B. Unlawful purpose.
 
 
 36
 The district court determined that the Secretary was without authority to promulgate the regulations in question because they were issued for the unlawful purpose of promoting a market for uncured products. In support of this position, the district court quotes the Final Impact Statement released by the USDA on June 14, 1979, which states that one of the purposes of the regulations is "to allow the use of familiar names for the traditional, but nitrite-free processed meat products. Allowing these products to be marketed by traditional names will increase consumer awareness of their availability as well as consumption by those wishing to forego consumption of nitrite cured products." In addition, the court noted that the agency considered continuing the prohibition on the use of traditional product names on meat products without nitrates or nitrites, but rejected this option because "it does not facilitate the development of markets for nitrate and/or nitrite-free products." This, the court concluded, proves that the agency acted with an improper purpose.
 
 
 37
 We disagree. Congress expressly charged the USDA with "assuring that meat and meat food products distributed to (consumers) are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. In our view, this directive authorizes the Department to ensure that the products desired by consumers be made available to them in a form and manner consistent with the public health and welfare. Every time the Secretary approves a product's ingredients or label, he, in one sense, is promoting that product. To be sure, the agency should not be promoting a particular company or a particular product of a particular company, but merely fulfilling consumer desires, while ensuring consumer health and safety, does not constitute such unlawful promotion.
 
 
 38
 The district court overlooked the agency's statement, both in the rulemaking notice and the explanation accompanying the final rule, that the regulations were proposed in response to requests by individual consumers, consumer interest groups and manufacturers. The comments support the agency's determination that nitrate and nitrite-free products were difficult to locate or not available to consumers. The regulation bears a rational relationship to this claimed purpose of availability.
 
 
 39
 Moreover, contrary to what the appellees would have us think, the producers of nitrate and nitrite-preserved products have no right to be free from competition. See Hiatt Grain & Feed, Inc. v. Bergland, 602 F.2d 929, 933 (10th Cir. 1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). See also Westport Taxi Serv., Inc. v. Adams, 571 F.2d 697, 700 n.3 (2d Cir.), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). The challenged regulation is actually an exception to USDA regulations that formerly prohibited selling nitrate and nitrite-free products under their traditional names. The producers of nitrited products enjoyed a benefit from the old rule, but they have no vested right in the continuation of it. Upon the Secretary's finding that it was in the public interest to permit marketing under traditional names, the competitive effect on the producers of nitrate and nitrite-preserved products is of no consequence.
 
 
 40
 Finally, we emphasize the modest nature of the USDA proposal. Despite sustained pressure to ban the use of all nitrites,[8] the agency determined that regulations permitting the sale of nitrate and nitrite-free products under traditional names would be sufficient to serve the public interest at this time. Under the new rules, no meat packer is required to manufacture nitrate and nitrite-free products, no wholesaler is required to supply them, and no retailer is required to stock them. Furthermore, the production and sale of nitrate and nitrite-preserved products are unaffected. In short, we conclude that the regulations are a rational response to the legitimate requests of concerned consumers and were not promulgated for an unlawful purpose.
 
 
 41
 C. Similarity requirement.
 
 
 42
 The district court's third rationale for invalidating the USDA regulations was that the requirement that uncured products be similar in size, flavor, consistency and general appearance to their cured counterparts was contrary to law. The court gave three reasons for this holding.
 
 
 43
 First, the court determined that "the similarity requirement is a standard of identity that bears no rational relationship to the purpose of such standards." In support of this assertion, the district court cited several cases purporting to define the purpose of the identity standards provisions of the Meat Inspection Act, 21 U.S.C. § 607(c). The court read these cases as holding that the purpose of such standards is to prevent the "economic adulteration" or to promote the "integrity" of meat food products. The similarity requirement in the challenged regulation does not serve this purpose, the court concluded, because it "will confuse, if not deceive, consumers as to the identity of the products they are receiving and the handling requirements of those products."
 
 
 44
 We cannot agree that the similarity requirement bears no rational relationship to the purposes of identity standards as intended by Congress. Initially, we note that none of the cases cited by the court involved successful challenges to USDA standards of identity. More importantly, we think it clear that Congress intended the USDA to have the authority to issue the type of regulation here in question. Section 21 of the Act, 21 U.S.C. § 621, gives the agency broad authority to implement the statute: "(The) Secretary shall * * * make such rules and regulations as are necessary for the efficient execution of the provisions of this Act." Section 7(c) of the Act, 21 U.S.C. § 607(c), specifically provides that the Secretary may prescribe labeling requirements "to avoid false or misleading labeling" as well as definitions and standards of identity or composition "whenever he determines such action is necessary for the protection of the public." In our view, the similarity requirement is well within these powers granted the Secretary by Congress. It is designed to prevent the sale of products under traditional names when those products bear no resemblance to items commonly sold under those names. When a consumer buys a product labeled "Uncured Hot Dog," he will receive a product similar to any other "Hot Dog." Thus, the requirement furthers the goals of the Act by promoting truthful labeling.
 
 
 45
 The second reason given by the district court for holding the similarity requirement unlawful is that it "is a subjective standard of identity that is beyond the (USDA's) authority to promulgate or enforce." The court offers no authority for this proposition, however, other than to say that a standard of identity "normally sets forth a 'recipe' for a food." (quoting American Frozen Food Inst. v. Mathews, 413 F.Supp. 548, 554 (D.D.C.1976), aff'd on other grounds, 555 F.2d 1059 (D.C.Cir.1977)).
 
 
 46
 We find this reasoning unpersuasive. As noted earlier, the statutory grant of authority to the Secretary is broad, and no restrictions on the permissible types of standards are contained in the statute. The Secretary's implementation of the Act shows that subjective standards were contemplated; a number of current USDA regulations specify standards of identity that are not based on objective criteria. See, e. g., 9 C.F.R. § 319.15(c) ("Beef Patties " "Binders (and other ingredients may be added) only in amounts such that the product characteristics are essentially that of a meat pattie."); §§ 319.15(e) & 319.29 ("Partially defatted beef fatty tissue " & "Partially defatted pork fatty tissue " "Such product shall have a pinkish color and a fresh odor and appearance"); § 319.80 ("Barbecued Meats " must have "the usual characteristics of a barbecued article"); § 319.181 ("Cheesefurters and similar products " "resemble frankfurters except that they contain sufficient cheese to give definite characteristics to the finished article."); § 319.700(a)(3)(iv) ("Oleomargarine or margarine " may contain "(a)ny safe and suitable artificial flavoring substance that imparts to the food a flavor in semblance of butter."). The district court disregarded these regulations, noting that the Administrator of the USDA's Food Safety and Quality Service told the Advisory Committee that the Department did not regulate flavor and taste. This reliance on the comment of the Administrator is misplaced; the regulations speak for themselves. The court apparently was persuaded by the difficulty in enforcing subjective standards, and it may well be that the Administrator would wish to avoid such standards for that reason. Nevertheless, if the Secretary decides he is willing to assume the burden of enforcing this subjective standard of identity, it is not for us to say it would be too difficult.
 
 
 47
 The district court's final reason for invalidating the similarity requirement is that it "is so unorthodox and contrary to previous USDA policy and practice that it was incumbent upon defendants to give a reasoned explanation for their decision to impose the requirement." The soundness of this reasoning, obviously, is dependent upon the validity of the district court's finding that the USDA had not previously established subjective standards of identity for food products. For the reasons stated above, we are satisfied that the Secretary has set such standards in the past. Accordingly, the district court's third rationale for holding the similarity requirement invalid must fall.
 
 
 48
 D. EIS requirement.
 
 
 49
 Section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), provides in part that a federal agency must prepare a "detailed statement," commonly known as an EIS, whenever it proposes "major Federal actions significantly affecting the quality of the human environment." The district court held that the USDA did not fulfill the requirements of the Act when it promulgated the regulations involved in this case because it failed "to make a determination as to whether an EIS should have been prepared and (it failed) to develop a reviewable administrative record supporting a negative decision * * *."
 
 
 50
 We are not willing to find the regulations infirm on this basis. The EIS requirement of 42 U.S.C. § 4332(2)(C) is triggered when an agency proposes major federal action "significantly affecting the quality of the human environment." In this case, the record does not support a finding that such environmental effects may result from implementation of the regulations; moreover, it is clear that the agency considered the potential for such effects. The only "environmental" effects mentioned by the district court were the "significant public health concerns * * * implicated by the regulation." As detailed earlier in this opinion, however, the record shows that the USDA gave full consideration to the question of the regulations' health effects and determined that no significant health dangers were presented. Consequently, the sole ground for finding the existence of a major federal action "significantly affecting the quality of the human environment" is unsupported, and no EIS need be filed.
 
 
 51
 The decision of the district court is reversed.
 
 
 
 *
 The Honorable WILLIAM L. HUNGATE, United States District Judge, Eastern District of Missouri, sitting by designation
 
 
 [1]
 Following the release of the 1978 Newberne Report, the FDA and the USDA established an Interagency Working Group on Nitrite Research to evaluate the MIT study. The interagency group, composed of scientists from the FDA, the USDA, the National Cancer Institute and the National Institute of Environmental Health Sciences, evaluated the design and conduct of the study and ordered an intensive pathology review of Dr. Newberne's diagnoses. In a report dated August 15, 1980, the group announced their findings, concluding that "insufficient evidence exists to support the conclusion that sodium nitrite per se fed to rats causes cancer, based on the MIT study." The FDA and USDA announced in a news release accompanying the report that they have decided to contract with the National Academy of Sciences to review all relevant data on nitrite before additional action is taken. The agencies stated that the National Academy of Sciences "will conduct an independent assessment of all available scientific information about nitrite and will analyze scientific data and develop a research agenda on potential alternatives to nitrite as a preservative in meats and poultry." The release concluded: "Because of its widespread usage, we believe that our agencies must continue to be concerned about the effects, if any, that nitrite consumption might have on the public's health."
 
 
 [2]
 9 C.F.R. § 318.7, which prohibits the use of nitrates or nitrites in baby, junior or toddler foods, is not being challenged in this action
 
 
 [3]
 The final regulations in question read as follows:
 § 317.17 Interpretation and statement of labeling policy for cured products; special labeling requirements concerning nitrate and nitrite.
 (b) Any products, such as bacon and pepperoni, which is required to be labeled by a common or usual name or descriptive name in accordance with § 317.2(c)(1) and to which nitrate or nitrite is permitted or required to be added may be prepared without nitrate or nitrite and labeled with such common or usual name or descriptive name when immediately preceded with the term "Uncured" as part of the product name in the same size and style of lettering as the product name, provided that the product is found by the Administrator to be similar in size, flavor, consistency, and general appearance to such product as commonly prepared with nitrate or nitrite, or both.
 (c)(1) Products described in paragraph (b) of this section or § 319.2 of this subchapter, which contain no nitrate or nitrite shall bear the statement "No Nitrate or Nitrite Added." This statement shall be adjacent to the product name in lettering of easily readable style and at least one-half the size of the product name.
 (2) Products described in paragraph (b) of this section and § 319.2 of this subchapter shall bear, adjacent to the product name in lettering of easily readable style and at least one-half the size of the product name, the statement "Not Preserved-Keep Refrigerated Below 40o F. At All Times" unless they have been thermally processed to Fo 3 or more; they have been fermented or pickled to pH of 4.6 or less; or they have been dried to a water activity of 0.92 or less.
 (3) Products described in paragraph (b) of this section and § 319.2 of this subchapter shall not be subject to the labeling requirements of paragraphs (b) and (c) of this section if they contain an amount of salt sufficient to achieve a brine concentration of 10 percent or more.
 § 319.2 Products and nitrates and nitrites.
 Any product, such as frankfurters and corned beef, for which there is a standard in this part and to which nitrate or nitrite is permitted or required to be added, may be prepared without nitrate or nitrite and labeled with such standard name when immediately preceded with the term "Uncured" in the same size and style of lettering as the rest of such standard name: Provided, That the product is found by the Administrator to be similar in size, flavor, consistency, and general appearance to such product as commonly prepared with nitrate and nitrite: And provided further, That labeling for such product complies with the provisions of § 317.17(c) of this subchapter.
 
 
 [9]
 C.F.R. §§ 317.17, 319.2 (1980)
 
 
 [4]
 The district court had earlier denied a motion for a temporary restraining order, but had granted a motion for a preliminary injunction
 
 
 [5]
 In addition, the court rejected the plaintiffs' contention that the nitrate and nitrite-free products must be labeled "imitation" in accordance with 21 U.S.C. § 601(n)(3) finding that the uncured products were not imitations of their cured counterparts
 
 
 [6]
 The public record also supports the proposition that consumers have become increasingly aware of the role of nitrates and nitrites in preserving meat products
 
 
 [7]
 To further guard against any botulism risk, the USDA printed, primarily for distribution to consumers in supermarkets, educational pamphlets warning of the handling requirements of uncured products
 
 
 [8]
 The district court stated that the public health threat from nitrite-induced cancer could not be considered as a valid purpose for the rule, because the USDA did not indicate in the final rules that the regulations' purpose was cancer prevention. We note that the failure to mention the alleged carcinogenic effects of nitrites was probably no accident. While the agency was studying the proposed rule, the United States Attorney General, in response to a USDA request, issued an opinion stating that if nitrites were found to be carcinogenic in animals, current law would require the USDA to ban their use in food products. See 43 Op. Att'y Gen. 1 (1979). Because scientific studies were not complete, the Secretary wisely decided to promulgate regulations not based on the asserted cancer dangers