_____

No. 95-2371

_____

Delores J. Kenney,                    *
                                      *
        Plaintiff/Appellant,          *
                                      *
Rosemary Behrens; Carol Hans;
              *
Madeline Meyer; David Nichols; *
Wayne Newton,                         *
                                      *
        Plaintiffs,                   *
                                      *
Irvin Fox; Skip Numrich;
                *
Gerald Timmerman; Larry Martin;
            *
James Willrett; James Scott;          *
H.T. Ringling; Richard Bell;          *
Jan Houck; Robert Perry;              *
Garland Dahl; John Haverhale;         *
Jack Knirk; Bill Long;                *
Mike Judy; Russ Dodge, Jr.;           *
Phil Van Horne,  *
                                      *
        Plaintiffs/Appellants,        *   Appeal from the United States
                                      *   District Court for the
Robert Rebholtz,                      *   Southern District of Iowa.
                                      *
        Plaintiff, *
                                      *
Bub Miller; Scott Adamson;            *
Paul Genho; Jim Keller;               *
Earnie Reeves;    *
Mark Armentrout,                      *
                                      *
        Plaintiffs/Appellants,        *
                                      *
        v.                            *
                                      *
Daniel Glickman,                      *
Secretary of Agriculture,             *
                                      *
        Defendant/Appellee.           *

_____

Submitted:  December 14, 1995

Filed:  September 30, 1996

_____

Before McMILLIAN and BEAM, Circuit Judges, and PERRY,[*]
     District Judge.

_____

PERRY, District Judge.

Delores Kenney and fellow poultry consumers appeal from the district court's order dismissing this action for failure to state a claim.  Because we find that the challenged actions and inactions of the Secretary of Agriculture are reviewable, we reverse and remand to the district court for a determination of whether the Secretary abused his discretion.

**I.**

The original plaintiffs, poultry consumers and red meat producers, brought an action against appellee Daniel Glickman, Secretary of Agriculture,[1] challenging certain aspects of the Department of Agriculture's regulatory scheme governing meat and poultry processing.  The district court held that the poultry consumers had standing to challenge the Secretary's actions, but the red meat producers did not have standing.  The red meat producers did not appeal that part of the district court's order.  With respect to the poultry consumers, the district court granted the Secretary's motion to dismiss for failure to state a claim, holding that the actions and decisions of the Secretary of Agriculture challenged by appellants are not subject to judicial review.  The poultry consumers have appealed that determination.

_____

     *The HONORABLE CATHERINE D. PERRY, United States District Judge for the Eastern District of Missouri, sitting by designation.

     [1]Defendant below was Mike Espy, who was Secretary of Agriculture at the time appellants brought this action.  Daniel Glickman, current Secretary of Agriculture, has replaced Espy as party to this action.

-2-

Appellants challenge certain actions and inactions by the Secretary of Agriculture regarding the processing of poultry.  The Secretary is responsible for implementing both the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 451 et seq., and the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 et seq.  The stated objectives and bases of the two Acts are identical:  to protect the health and welfare of consumers and to eliminate the burdens on interstate commerce that result from the distribution of unwholesome, adulterated or mislabeled products.  With respect to the health of consumers, both parties provided statistics regarding the large number of contaminated meat and poultry carcasses processed each year and the negative consequences resulting from human consumption of the contaminated carcasses.  In light of the identical goals of the two Acts, appellants allege that the Secretary has issued contradictory requirements for the inspection and cleaning of meat and poultry, and that the Secretary has improperly allowed water absorbed during processing to remain in poultry.

The processing of meat and poultry begins with the removal of certain parts of the carcasses.  The carcasses and parts are then either sold or processed further.  Because both meat and poultry are sold by weight, any moisture added during processing increases the value of the carcass.  Similarly, any trimming of the carcass during processing to remove contaminants reduces the value of the carcass.  To further the goals of the PPIA and FMIA, the regulations require ante- and post-mortem inspections of the livestock and poultry processed for human food.  In technical terms, the purpose of the inspections is to ensure that the carcasses are not "adulterated" or "misbranded."  The definitions of those two terms are nearly identical under the two Acts.

Individual meat and poultry carcasses are inspected during processing, and carriers of E. coli and other pathogens are removed.  The well-known contaminants that carry pathogens are

feces, ingesta and milk.  If contaminants are found on an individual meat or poultry carcass, the regulations require processors to remove the contaminants.  The regulations refer to this as "zero tolerance" with respect to individual carcasses.  After the individual carcasses have been inspected and reprocessed as necessary, the inspector reinspects sample carcasses selected from the entire lot to determine whether there was a "process defect" that may have caused contaminants to exist on carcasses in that particular lot.  Before March 1993, the regulations established a tolerance slightly above zero with respect to process defects in both poultry and meat.  In other words, if the number of defects discovered on the sample carcasses was less than the tolerance level, the entire lot could proceed.  If the defects exceeded the tolerance level, the entire lot failed and corrective action was required.

In March 1993, the Secretary issued directives to operators and inspectors of beef slaughter plants.[2]  The directives -- which affected meat but not poultry -- lowered the tolerance level for process defects to zero.  The directives did not affect the tolerance level for individual carcasses, i.e., the tolerance for contaminants on individual carcasses remains zero for both meat and poultry.  The tolerance level for process defects in poultry remains slightly above zero.  In other words, a certain level of contaminants discovered in poultry during the process inspection is acceptable and the lot will not be returned for reprocessing.

In addition to the different standards of tolerance for process defects, the methods of contaminant removal approved by the Secretary also differ between meat and poultry.  The regulations governing inspections require meat processors to trim or otherwise actually remove the contaminated tissue, while the regulations

_____

[2]In December 1993, interim guidelines replaced the March 1993 directives with no relevant substantive changes.

allow poultry processors to "water wash" the contaminated portion of the carcass.

Appellants challenge the Secretary's decisions with respect to (1) the "zero tolerance" for process defects in meat but not poultry and (2) the regulations allowing poultry processors to water wash rather than trim contaminants. Appellants contend that the Secretary should either issue the same regulations for poultry and meat or provide a legally sufficient reason for treating meat and poultry differently.

Finally, appellants challenge certain water-retention regulations governing poultry. The regulations governing water absorbed during processing differ between meat and poultry. The meat regulations prohibit processors from adding water and other substances to a meat carcass during processing. Poultry carcasses, on the other hand, may absorb and retain an average of eight percent increase over the weight of the carcass before final washing. Appellants challenge this regulation on two grounds. First, irrespective of the meat regulations, appellants allege that the Secretary has violated the Poultry Act's prohibitions against "adulterated" and "misbranded" carcasses by allowing water retention in poultry. Second, appellants allege that the Secretary has acted arbitrarily and capriciously by allowing retention of water in poultry but not in meat.

## II.

The district court held that none of the Secretary's challenged actions or inactions are reviewable. With respect to the zero tolerance and contaminant removal standards, the court looked to the introductory language of the PPIA and held that "that statute has been drawn so broadly that there is no standard available for judging how and when the agency should exercise its discretion." Likewise, the court held that decisions regarding

retention of water during poultry processing are "left completely to the discretion of the Secretary." We review the district court's decision <u>de novo</u>. <u>Thomas W. Garland, Inc. v. City of St. Louis</u>, 596 F.2d 784, 787 (8th Cir.), <u>cert.</u> <u>denied</u>, 444 U.S. 899 (1979).

The Administrative Procedure Act (APA) is the starting point for a discussion of reviewability of an agency action. The APA provides that any person "adversely affected or aggrieved" by a "final agency action for which there is no other adequate remedy" is generally entitled to judicial review. 5 U.S.C. §§ 702, 704.[3] There are two exceptions to the general rule of reviewability: (1) where the statute explicitly precludes judicial review, and (2) where "agency action is committed to agency discretion by law." <u>Id.</u> § 701(a). In <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402 (1971), the Supreme Court noted that the second exception was "very narrow" and that "it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" <u>Id.</u> at 410 (footnote omitted) (quoting S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). The Court again discussed the second exception to reviewability in <u>Heckler v. Chaney</u>, 470 U.S. 821 (1985). In <u>Chaney</u>, the Court created a rebuttable presumption that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" under § 701(a)(2) of the APA. <u>Chaney</u>, 470 U.S. at 831.

In this case, neither party contends that any of the three challenged actions are explicitly precluded from judicial review by statute, and therefore the first exception to reviewability does

---

[3]The APA judicial review provisions apply equally to agency action and agency inaction. 5 U.S.C. §§ 551(13), 706(1); <u>see also</u> <u>Iowa ex rel. Miller v. Block</u>, 771 F.2d 347, 352 (8th Cir. 1985), <u>cert.</u> <u>denied</u>, 478 U.S. 1012 (1986).

not apply.  Appellee contends that its regulations regarding zero tolerance and contaminant removal are enforcement decisions that are presumptively unreviewable under Chaney.  Appellants contest the characterization of these regulations (or lack thereof) as enforcement decisions, and claim that they are reviewable.  With respect to the Secretary's decision to allow water absorption into poultry, appellee apparently does not dispute that the action is reviewable, and instead argues that the Secretary's actions were not arbitrary and capricious.

## III.

Appellee contends that the Secretary's decisions to reject a zero tolerance standard for poultry process defects and to allow water washing of poultry contaminants are the type of enforcement decisions that the Supreme Court declared presumptively unreviewable in Heckler v. Chaney, 470 U.S. 821 (1985).  In support of his argument, appellee states that the meat and poultry inspection processes are the same, and that the Secretary has merely made a decision to use agency resources to enforce the meat inspection processing regulations more vigorously as part of a "high priority" to prevent pathogens in the nations's meat supply.

We reject appellee's characterization of the zero tolerance and water washing policies as enforcement decisions; we find that Chaney does not establish a presumption of unreviewability in this case.  In Heckler v. Chaney, the Court held that the Food and Drug Administration's decision not to take enforcement actions to prevent the use of lethal injections was not subject to review.  Id.  According to the Court, a decision not to enforce "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  Id. at 831.  The Court stated the following reasons for the general unsuitability of judicial review of enforcement actions:

> [T]he agency must not only assess whether a violation has
> occurred, but whether agency resources are best spent on this
> violation or another, whether the agency is likely to succeed
> if it acts, whether the particular enforcement action requested
> best fits the agency's overall policies, and, indeed, whether
> the agency has enough resources to undertake the action at all.
> An agency generally cannot act against each technical violation
> of the statute it is charged with enforcing. The agency is far
> better equipped than the courts to deal with the many variables
> involved in the proper ordering of its priorities.

Id. at 831-32.

The Secretary's decisions regarding zero tolerance and water washing are not Chaney-type enforcement actions. The Secretary has not decided "whether a violation has occurred," has not decided whether he will "succeed" if he acts, and has not determined which "technical violations" to act against. Rather, the Secretary has adopted general policies stating that the tolerance level of process defects in poultry is slightly above zero while the tolerance level of process defects in meat is zero, and that poultry contaminants can be water washed rather than trimmed while meat contaminants must be trimmed. Those policies are the standards that the Secretary deems acceptable to implement the goals of the PPIA and FMIA.

Likewise, this is not a case where the Secretary has refused to institute proceedings. In support of the presumption of unreviewability, the Court in Chaney stated:

> Finally, we recognize that an agency's refusal to institute
> proceedings shares to some extent the characteristics of the
> decision of a prosecutor in the Executive Branch not to indict
> -- a decision which has long been regarded as the special
> province of the Executive Branch . . .

Id. at 832. This language suggests that Chaney applies to individual, case-by-case determinations of when to enforce existing regulations rather than permanent policies or standards. An example highlights the distinction: A prosecutor refuses to

institute proceedings when he or she decides not to prosecute an individual possessing one ounce of marijuana; Congress would not be characterized as "refusing to institute proceedings" under Chaney if it amended the drug laws to exclude simple possession of one ounce or less of marijuana as a crime.

In sum, we do not believe the Court in Chaney intended its definition of "enforcement action" to include an interpretation by an agency that the statute's goals could be met by adopting a certain permanent standard.[4] See, e.g., Arent v. Shalala, 70 F.3d 610, 614 (D.C. Cir. 1995) ("Chaney is of no assistance to the [agency] in this case because the [agency's] promulgation of a standard for 'substantial compliance' under the [Act] does not represent an enforcement action."); Edison Elec. Institute v. U.S. EPA, 996 F.2d 326, 333 (D.C. Cir. 1993) ("Petitioners are not challenging the manner in which the [agency] has chosen to exercise its enforcement discretion . . . Instead, petitioners are challenging the [agency's] interpretation of [the Act] and its implementing regulations . . . Clearly, this interpretation has to do with the substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that Heckler shields from judicial review."); National Treasury Employees Union v. Horner, 854 F.2d 490, 496 (D.C. Cir. 1988) ("[The agency's] decision to develop some but not other competitive examinations . . . is a major policy decision, quite

---

[4]The Court in Chaney recognized that it was not addressing the situation "where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," and therefore expressed no opinion as to whether such decisions would be unreviewable under § 701(a)(2). Chaney, 470 U.S. at 833 n.4. In this case, the Secretary's zero tolerance and contaminant removal standards are conscious and express general policies. Although appellants have not argued that this case involves an extreme policy that is an "abdication" of the Secretary's responsibilities, we find that the Court's distinction in footnote four of Chaney between general policies and enforcement actions supports our conclusion.

different from day-to-day agency nonenforcement decisions . . ."). The poultry policies allowing greater than zero tolerance of process defects and water washing of contaminants are policy decisions based on the Secretary's interpretation of the PPIA in light of the goal to protect consumers from health risks.

**IV.**

Having determined that the Secretary's zero tolerance and water washing policies for poultry do not qualify as enforcement actions, we continue to review the Secretary's challenged inactions under the relevant provisions of the APA. The Secretary's decisions with respect to poultry are presumed reviewable unless there is no law to apply. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971). In general, there is a strong presumption that Congress intends judicial review of administrative action. Abbott Lab. v. Gardner, 387 U.S. 136, 140 (1967). "Judicial review of a final agency action will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress." Id.

Courts have found that "law to apply" may exist in the underlying statute or in regulations by the agency interpreting the underlying statute. See, e.g., Safe Energy Coalition of Michigan v. U.S. Nuclear Regulatory Comm'n, 866 F.2d 1473, 1478 (D.C. Cir. 1989); Center for Auto Safety v. Dole, 846 F.2d 1532, 1534 (D.C. Cir. 1988) (per curiam). Both the PPIA and the Secretary's regulations under the FMIA provide law to apply in reviewing the Secretary's inaction with respect to zero tolerance and water washing. The district court relied on the introductory language to the PPIA and found that it was so broad that there was no law to apply. However, appellants rely on more than the introductory language to the PPIA regarding protection of consumers' health; appellants also rely on the language in the PPIA mandating that the Secretary prevent adulterated poultry products from entering

commerce.  See 21 U.S.C. §§ 453(g), 455.  We find that the prohibition of "adulterated" products found in the PPIA provides a sufficient standard by which the district court can examine the Secretary's zero tolerance and water wash policies that govern poultry processing.  The district court must examine the Secretary's reasons for adopting the policies in light of the goals of the PPIA and the definition of "adulterated" to determine whether the Secretary's action or inaction was arbitrary and capricious or an abuse of discretion.

In addition, the Secretary's regulations and policies regarding meat that were implemented pursuant to the FMIA provide law to apply.  The PPIA and FMIA are identical in several respects, and parallel in most other respects.  The legislative history of the two Acts and subsequent amendments indicate a congressional intent to construe the PPIA and the FMIA consistently.  American Public Health Ass'n v. Butz, 511 F.2d 331, 335 (D.C. Cir. 1974); see also H.R. Rep. No. 1333, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 3426.  Courts have also held that, in general, similar or parallel statutes should be interpreted consistently whenever possible.  See, e.g., Greenwood Trust Co. v. Massachu-setts, 971 F.2d 818, 827 (1st Cir. 1992), cert. denied, 506 U.S. 1052 (1993); FAIC Securities, Inc. v. United States, 768 F.2d 352, 363 (D.C. Cir. 1985). Although there is no requirement that the regulations interpreting the PPIA and FMIA be identical, we believe that the Secretary's interpretation of the FMIA -- which resulted in a zero tolerance of process defects in meat and a requirement that meat processors trim contaminants -- provides law to apply in evaluating the regulations interpreting the nearly identical PPIA.  The Secretary may have legitimate, rational reasons for differing between meat and poultry.  However, in light of the strikingly similar goals and language of the two statutes, we hold that there is law to apply to determine whether the Secretary acted arbitrarily and capriciously in distinguishing between poultry and meat in implementing regulations governing contaminants during

-11-

processing.  Because the district court found the actions unreviewable, it did not proceed to review them.  Accordingly, Count I will be remanded to the district court for review of the Secretary's actions.

**V.**

Appellants have also challenged the Secretary's regulations allowing up to 8% water to be absorbed during poultry processing.  It is undisputed that these regulations are not "enforcement actions" under <u>Heckler v. Chaney</u>, but rather are agency interpretations of the PPIA and FMIA.  In addition, appellee does not appear to argue that there is no law to apply or that the decision to allow poultry to absorb some water is "committed to agency discretion."  Rather, appellee appears to have conceded that the actions are reviewable, and essentially argued to this Court that the regulations are a reasonable interpretation by the Secretary of the PPIA.

Appellants are correct that this action is reviewable because there is law to apply -- both the PPIA itself and the Secretary's interpretation of the nearly identical FMIA.  Appellants challenged the poultry water retention regulation under the PPIA provision prohibiting adulterated and misbranded poultry products.  The relevant definitions of "adulterated" and "misbranded" are identical under the PPIA and FMIA.  <u>Compare</u> 21 U.S.C. § 453(g), (h) <u>with</u> 21 U.S.C. § 601(m), (n).  However, the regulations permit up to 8% water to be retained during the processing of poultry, <u>see</u> 9 C.F.R. § 381.66 (1995), whereas the meat regulations do not allow the retention of water or any other substance during processing, <u>see</u> 9 C.F.R. § 301.2(c)(8) (1995).

Under the PPIA, a poultry product is "adulterated" if "any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength,

-12-

or make it appear better or of greater value than it is."  21 U.S.C. § 453(g)(8).  This definition provides law to apply.  The district court can review whether the Secretary has properly excluded water absorbed during processing from the class of substances prohibited by the PPIA from being added to poultry.  In addition, the court can compare the Secretary's poultry and meat regulations to determine whether the Secretary has acted arbitrarily and capriciously or abused his discretion by treating meat and poultry differently.

Likewise, the definition of "misbranded" provides law to apply, as evidenced by the numerous court decisions reviewing agency action and inaction challenged as violations of the prohibition against misbranded poultry products.  See, e.g., American Meat Institute v. USDA, 646 F.2d 125 (4th Cir. 1981); National Pork Producers Council v. Bergland, 631 F.2d 1353 (8th Cir. 1980), cert. denied, 450 U.S. 912 (1981); American Public Health Ass'n v. Butz, 511 F.2d 331 (D.C. Cir. 1974).  Appellants contend that the current poultry regulations regarding water retention violate two of the provisions in the definition of "misbranded" poultry under the PPIA. First, a poultry product is misbranded "if its labeling is false or misleading in any particular."  21 U.S.C. § 453(h)(1).  Second, a poultry product is misbranded:

> [U]nless it bears a label showing . . . (B) an accurate statement of the quantity of the product in terms of weight, measure, or numerical count:  Provided, That under clause (B) of this subparagraph (5), reasonable variations may be permitted, and exemptions as to small packages or articles not in packages or other containers may be established by regulations prescribed by the Secretary.

21 U.S.C. § 453(h)(8).  The district court relied on the "reasonable variation" and "exemptions . . . may be established" language contained in § 453(h)(5) to conclude that all interpretations of the term "misbranded" were committed by Congress

to agency discretion.  This conclusion affords too much weight to provisions that are merely a part of the definition of "misbranded," and that appear to apply only in very narrow situations.  See generally Rath Packing Co. v. Becker, 530 F.2d 1295, 1298-1301, 1308-12 (9th Cir. 1975), aff'd, 430 U.S. 519 (1977); see also 9 C.F.R. §§ 317.2, 317.19 (1995) (defining scope of "reasonable variations").  There is nothing in the definition of "misbranded" that indicates Congress intended to afford complete discretion to the agency regarding decisions such as the water absorption provisions challenged in this case.  Because appellee has not overcome the presumption of reviewability with respect to the poultry regulations that allow some water to be absorbed, Count II will be remanded to the district court for review of the Secretary's actions.

**VI.**

In conclusion, we reverse and remand this action to the district court on both Counts I and II for a review of the Secretary's actions.

McMILLIAN, Circuit Judge, dissenting in part.

I respectfully dissent in part.  I would affirm the district court's dismissal of appellants' claim in Count I of the complaint.  In my opinion, the Secretary's decisions not to enforce a zero tolerance standard for poultry process defects and to allow water washing of poultry contaminants are nonreviewable enforcement decisions under Heckler v. Chaney, 470 U.S. 821, 831-32 (1985).  However, for the reasons stated in Part V of the majority opinion, I agree that the district court's dismissal of appellants' claim in Count II of the complaint (concerning the water absorption regulations) should be reversed, and that claim remanded for review.

A true copy.

Attest:

       CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.