**CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, et al., Plaintiffs,**

v.

**U.S. DEPARTMENT OF JUSTICE, et al., Defendants.**

**No. CIV.A.02–2081 (JDB) EC.**

United States District Court, District of Columbia.

May 21, 2003.

**16**

Lawrence Schneider, Jean Engelmayer Kalicki, Thomas Sydnor, Kendall Millard, Leslie Marie Hill, Arnold & Porter, Washington, DC, for Plaintiffs.

Mark Walters, Margaret Perry, Audrey Benison Hemesath, U.S. Department of Justice, Office of Immigration Litigation, Civil Division, Washington, DC, for Defendants.

### MEMORANDUM OPINION

BATES, District Judge.

Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR") and American Immigration Lawyers Association ("AILA"), both non-profit immigrant rights advocacy organizations, have asserted a broad challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to regulations issued by the Department of Justice ("Department" or "DOJ") establishing procedural reforms for the Board of Immigration Appeals ("BIA" or "Board"). *See* 67 Fed.Reg. 54878 (August 26, 2002). Defendants, the Department of Justice, the Executive Office for Immigration Review, and the Attorney General, have moved to dismiss plaintiffs' complaint for lack of standing, mootness, unreviewability under the APA, and failure to state a claim. The parties have also cross-moved for summary judgment.

## I. BACKGROUND

Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress delegated authority to the Attorney General for administration and enforcement of laws relating to the immigration and naturalization of aliens, and authorized the Attorney General to promulgate regulations and rules for carrying out this responsibility. *See* 8 U.S.C. § 1103(a)(1)-(3). In 1983, in an effort to consolidate the adjudicatory framework for immigration matters, the Attorney General established the Executive Office for Immigration Review ("EOIR"), an administrative division within the Department of Justice under the direction of the Attorney General. *See* 52 Fed.Reg. 2931 (Jan. 29, 1987); 8 C.F.R. § 1003; 28 C.F.R. § 0.115.[1] Since 1940, Attorneys General have delegated their authority to the BIA to resolve administrative appeals from immigration judges who adjudicate immigration matters. *See* 8 C.F.R. § 1003.1(d); *see also Accardi v. Shaughnessy*, 347 U.S. 260, 266, 74 S.Ct. 499, 98 L.Ed. 681 (1954). The Board consists of several administrative judges and is charged with interpreting and applying the nation's immigration

---

**1.** After plaintiffs filed their complaint, Congress amended the INA to transfer the Attorney General's authority over administration and enforcement of immigration laws to the new Secretary of Homeland Security. *See* Pub.L. 107–296, § 1102(2)(B), as added by Pub.L. 108–7, Div. L, § 105(a)(1). These amendments, however, do not affect the Attorney General's direction and regulation of EOIR, or the Attorney General's power to establish regulations for immigration proceedings. *See* 8 U.S.C. § 1103(g).

laws and providing precedent for immigration judges. "The mission of the Board of Immigration Appeals is to provide fair and timely immigration adjudications and authoritative guidance and uniformity in the interpretation of the immigration laws." 64 Fed.Reg. 56135, 56136 (Oct. 18, 1999). Because Board decisions can only be challenged in federal court in limited circumstances, the Board is often the final authority for adjudicating appeals from rulings of immigration judges and officers of the Immigration and Naturalization Service ("INS"). The Board decides critical immigration matters such as deportation, exclusion, removal and asylum, as well as matters arising under the United Nation's Convention Against Torture.

Since 1990, the Board has experienced an unprecedented increase in the number of immigration cases. In 1984, for example, the Board received fewer than 3,000 appeals, but by 1992 the number had grown to almost 13,000, and by 2000 it had increased to nearly 30,000 appeals annually. Administrative Record ("A.R.") 425, 690. There were only 69 immigration judges in 1990, but by the end of the decade the number had swollen to 200. A.R. 679. Compounding the dramatic increase in immigration cases, Congress made "[f]requent and significant changes in the complex immigration laws" over the last several years. 64 Fed.Reg. at 56136. Indeed, since 1986, there have been several major overhauls in the immigration laws, severely challenging the Board's ability to resolve appeals in a timely manner and provide guidance and precedent for immigration judges.[2] To help the Board cope with this growing caseload, the Attorney General steadily increased the Board's size from 5 members to 12 members in 1995, to 15 members in 1998, to 19 members in 1999, and to 23 members by 2001. See A.R. 690; see also 64 Fed.Reg. at 56139. Due to unfilled vacancies and reassignment, there were 19 Board members when plaintiffs filed their complaint. A.R. 690. Prior to 1999, the Attorney General had authorized the Board chairman to divide the Board into three-member panels (like federal appellate courts) that decide cases by majority vote and issue written opinions. See 8 C.F.R. § 1003.1(a)(1) (1998).

Despite these repeated increases in size, however, the pending caseload of the Board outpaced the addition of new members to the Board. In 1992, the Board had just over 18,000 pending appeals, but by 2001, despite a four-fold increase in the number of Board members, the caseload had grown to more than 57,000 pending cases. 67 Fed.Reg. at 54878.

Given the dramatic rise in the Board's pending caseload, DOJ promulgated a new regulation in 1999 to "streamline" the Board's appellate review procedures by limiting the use of three-member panels to cases "where there is a reasonable possibility of reversible error in the result below." 64 Fed.Reg. 56136. This streamlining regulation authorized a single Board member to summarily affirm, without a written opinion, cases in which (1) the result below was correct; (2) any errors below were harmless or nonmaterial; or (3) either the issue on appeal was squarely controlled by existing Board or court precedent and did not involve a novel fact

---

**2.** This overhaul of the nation's immigration laws included the Immigration Reform and Control Act of 1986, the Immigration Act of 1990, the Antiterrorism and Effective Death Penalty Act of 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Furthermore, the decision in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), also "resulted in hundreds, if not thousands, of remands to the Board and Immigration Judges." A.R. 868.

situation, or the factual and legal questions on appeal were so insubstantial as not to warrant a three-member panel. 8 C.F.R. § 1003.1(a)(7)(ii). If an appeal fell within any of these categories, a single Board member could issue a short statement affirming the result of the decision below. *Id.* at § 1003.1(a)(7)(iii). The intent was to enable the Board to render decisions in a more timely manner, while concentrating its resources primarily on cases in which there is a reasonable possibility that the result was incorrect, or where new or significant issues are presented.[3]

In 2001, the Department of Justice commissioned an external audit by Arthur Anderson to evaluate the effectiveness of the 1999 streamlining regulation. A.R. 516–611. Arthur Anderson issued its Assessment Report on December 13, 2001, finding that streamlining contributed to an overall 53 percent increase in the number of cases resolved by the Board. A.R. 523.[4] The report concluded that "[t]he overwhelming weight of both 'objective' and 'subjective' evidence gathered during the conduct of this study indicates that the Streamlining Pilot Project has been an unqualified success." A.R. 539. At the same time, Anderson cautioned that "[s]treamlining has not been implemented long enough to provide a sufficient amount of historical data to *objectively* evaluate its effect upon the quality of decisions rendered." A.R. 528.

Citing the success of the 1999 streamlining regulation, DOJ proposed a more sweeping streamlining regulation on February 19, 2002. *See* 67 Fed.Reg. 7309. The proposed 2002 streamlining regulation expanded the number of cases referred to a single Board member, with the result that most Board appeals would be resolved by summary affirmance without opinion, and only a limited category of cases would qualify for review by a three-member panel. A.R. 7. DOJ also proposed to reduce the number of Board members from 23 to 11 within six months of the regulation taking effect. 67 Fed.Reg. at 7310. Similarly, the regulation proposed to address the Board's massive backlog of pending cases within a six-month transition period. *Id.* at 7312.

The proposed 2002 streamlining regulation was intended to reduce appeal delays, enable the Board to better manage its growing caseload, and resolve the Board's existing backlog of cases—in turn giving the Board more time to focus its attention on significant cases:

> Under its current structure and procedures, the Board has been unable to adjudicate incoming cases quickly enough to eliminate the unacceptable backlog that has existed for several years.... Since 1995, the problem of the mounting backlog of cases has been addressed by incremental increases in

---

**3.** The 1999 streamlining regulation also included a provision that authorized the Board chairman to designate other categories of cases as suitable for summary affirmance, without opinion, by a single Board member or a three-member panel. *Id.* at § 1003.1(a)(7)(i). Pursuant to this authority, Board chairmen have issued 18 separate internal memoranda designating various categories of cases as appropriate for streamlined review. Three such memoranda were issued in 2002, designating for summary affirmance and single member review all cases involving

appeals from immigration judges over which the Board has jurisdiction. A.R. 688.

**4.** The Anderson report found that, prior to the implementation of the 1999 streamlining regulation, only 25 percent of appeals were resolved within 90 days; after streamlining, this number rose to 56 percent. A.R. 525. In a survey of EOIR staff members, Anderson found that more than 77 percent believed that streamlining had benefitted the Board's case processing, while only 3 percent disagreed. A.R. 533.

the size of the Board. However, in retrospect, it is now clear that the addition of new Board members has not appreciably reduced the backlog of cases. The problem is not one of personnel. Rather, the problem is rooted in the structure and procedures of the Board, which make it nearly impossible for Board members to accomplish their mission. The devotion of the Board's time and resources to cases that present no colorable grounds for appeal has made it extremely difficult to address in a timely manner those cases that most need the Board's review.

67 Fed.Reg. at 7310. DOJ concluded that "[t]he one change in the Board's procedures that has produced positive results in recent years is the streamlining initiative." *Id.*

DOJ listed four overlapping objectives for the proposed 2002 streamlining regulation: (1) eliminate the current backlog of cases pending before the Board; (2) eliminate unwarranted delays in the adjudication of administrative appeals; (3) utilize the resources of the Board more efficiently; and (4) allow more resources to be allocated to the resolution of cases that present difficult or controversial legal questions. *Id.* The proposed regulation was submitted for a 30–day comment period, during which 68 submissions were received, including comments from nongovernmental organizations, members of Congress, and private attorneys, as well as plaintiffs CAIR and AILA. *See* 67 Fed. Reg. at 54879. The proposed 2002 streamlining regulation would amend and supercede the 1999 streamlining regulation.

After considering the comments to the proposed regulation, DOJ published its final regulation on August 26, 2002, leaving the provisions of the proposed regulation largely unchanged, including expanded use of a streamlining process in which single-member review is the predominant method of adjudication for most cases—cases that "do not present novel or complex issues." 67 Fed.Reg. at 54880. The regulation streamlines cases unless review by a three-member panel is needed for one of six reasons: (1) to settle inconsistencies among immigration judges; (2) to establish precedent construing laws or regulations; (3) to review a legally erroneous decision; (4) to resolve a case of national import; (5) to review a factual determination that is erroneous; or (6) to reverse a decision. 8 C.F.R. § 1003.1(e)(6). If an appeal falls within one of these categories, the final regulation authorizes a single Board member to refer the case for review to a three-member panel. *Id.* The final regulation explains that "[t]his process will resolve simple cases efficiently while reserving the Board's limited resources for more complex cases and the development of precedent to guide the immigration judges, the [INS], attorneys and accredited representatives." 67 Fed.Reg. at 54880.

If a case does not qualify for one of these six exceptions, a single Board member reviewing the case may summarily affirm the decision without a written opinion. 8 C.F.R. § 1003.1(e)(4)(i). If the decision below is not appropriate for summary affirmance, the Board member is required to issue a brief order affirming, modifying, reversing, or remanding the decision under review. *Id.* at § 1003.1(e)(5). The final regulation also requires the Attorney General to reduce the size of the Board to 11 members. *Id.* at § 1003.1(a)(1).[5]

---

**5.** The final regulation made a number of other procedural changes to the immigration appeal process. In an effort to decrease processing time, the regulation shortened the briefing time for cases before the Board from 30 days to 21 days, allowing extensions of

The regulation became effective on September 25, 2002, and plaintiffs filed their complaint on October 24, 2002. Plaintiffs contend that the regulation was issued in violation of the APA. They allege that defendants, in deciding to promulgate these rules, failed to employ reasoned decision-making, failed adequately to respond to comments and adverse evidence cited in comments to the proposed rule, departed from previous practices and findings, and supported their result with inconsistent and contradictory reasoning. Compl. ¶ 81. Plaintiffs seek a declaration that the final rule is arbitrary and capricious under the APA, and that the issuance of three internal agency memoranda by the Board chairman in early 2002 also violated the APA. Plaintiffs request vacatur of the regulation and of the three challenged agency memoranda.[6]

## II. STANDING

■ Defendants contend that neither CAIR nor AILA have established that they have standing to bring their claims. The Court concludes, however, that CAIR has associational standing to assert claims on behalf of its members who are immigrants with cases pending before the Board. The Supreme Court has recognized "that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of indi-

vidual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551–52, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

There is no dispute that CAIR satisfies the second and third prongs of the associational standing test. The interests CAIR seeks to protect are certainly germane to the organization's purpose. This second prong "raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food*, 517 U.S. at 555–56, 116 S.Ct. 1529. CAIR's executive director has explained that "the CAIR Coalition combines the efforts of more than one hundred advocates, community organizations, immigrants and other individuals working together to meet the legal needs and promote the civil rights of immigrants in the Washington, D.C. metropolitan area." Sanders Aff. ¶ 3. As an advocate for local immigrants with cases before the BIA, CAIR thus easily satisfies the requirements of this prong. Moreover, the claims asserted and the relief requested do not require the participation of individual members of CAIR in this challenge to the regulation. The declaratory and injunctive remedies sought by CAIR do not require "individualized proof . . . [and] thus are properly resolved in the group context." *Hunt*, 432 U.S. at 344, 97 S.Ct.

---

time when warranted. 8 C.F.R. § 1003.3(c). Moreover, the regulation established a simultaneous briefing schedule for cases involving aliens in detention, and sequential briefing in all other matters. *Id.* The regulation further established that the standard of review for questions of fact shall be "clearly erroneous," but for all other questions, including ques-

tions of law, the standard of review would remain "de novo." *Id.* 1003.1(d)(3).

**6.** On March 31, 2003, the Court denied plaintiffs' request for an emergency injunction restraining the Attorney General from implementing a reduction in the Board's size.

2434. Hence, the third prong of the test is met as well.

 This leaves only the first prong of the associational standing test. "Standing of an association as a representative of members requires that at least some of the members would have standing to sue in their own right." *Fed'n for American Immigration Reform v. Reno*, 93 F.3d 897, 899 (D.C.Cir.1996); *see also United Food*, 517 U.S. at 555, 116 S.Ct. 1529 (the first element of associational standing test "require[s] an organization suing" to have "at least one member with standing to present, in his or her own right, the claim"); *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 311 (D.C.Cir.1987) ("[A]n organization must allege facts showing that one or more of its members is among the persons injured by the challenged agency action."); *Am. Immigration Lawyers Ass'n v. Reno*, 18 F.Supp.2d 38, 50 (D.D.C.1998), *aff'd*, 199 F.3d 1352 (D.C.Cir.2000).

CAIR has submitted affidavits from two immigration lawyers who represent individual CAIR members having immigration appeals before the Board. Theodore Cox explained that he represents 44 CAIR members who are nationals from the People's Republic of China seeking asylum under the Convention Against Torture, and who have had appeals decided before and after the effective date of the regulation. *See* Cox Aff. ¶ 5. Cox states that "the Final BIA Regulations, especially the provisions for review by single board members and summary affirmance without opinion, will prevent my clients from receiving a just appeal at the BIA, ... [and] prevent these individuals from receiving proper consideration of their appeals before the BIA." *Id.* at ¶ 7. Cox identified 15 CAIR members by name, and identified the dates of the dispositions of their appeals. *Id.* He has submitted the declaration on their behalf "because of the impracticability of obtaining separate declarations from each member," many of whom do not speak English, and because some clients "have requested anonymity because of concerns that participation in this litigation could adversely affect their individual cases." *Id.* at ¶ 4. Similarly, Thomas Hutchins, who also represents immigrants who belong to CAIR and have appeals before the BIA, submitted an affidavit identifying six CAIR members who "have been or may in the future be adversely affected by the final BIA restructuring rules." Hutchins Aff. at ¶ 3.

 When it brought this lawsuit, CAIR "had approximately fifty individual members who had or currently have appeals pending at the BIA." Sanders Aff. at ¶ 7. CAIR asserts that the regulation will injure immigrants who are CAIR members:

> The appeals of some of our individual members have been summarily affirmed by single Board members under the Memoranda and the new Final BIA Regulations. These single-member summary affirmances have denied our members a full and fair hearing of their cases by the [Board of Immigration Appeals]. As a result they may be unfairly denied the relief sought and are subject to removal from the United States.

*Id.* It is thus clear that immigrants with pending Board appeals belong to CAIR and may be adversely affected by the new regulation. While the affidavits were submitted by counsel on behalf of the immigrants, they nonetheless contain the requisite information that satisfies the first prong for associational standing. The Court therefore finds that CAIR has met its burden of establishing associational standing to assert the claims of its individ-

ual members.[7]

## III. REVIEWABILITY

■ The Department contends that its final regulation is not reviewable under the APA, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA carves out an exception to judicial review "to the extent that ... agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Department contends that the INA delegated the administration and enforcement of immigration laws to the Attorney General and therefore commits the procedures and regulations for adjudicating immigration appeals to the Attorney General's discretion.

■ "As the Supreme Court has instructed, 'we begin with the strong presumption that Congress intends judicial review of administrative action.' " *Inova Alexandria Hospital v. Shalala*, 244 F.3d 342, 346 (4th Cir.2001) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)); *see also Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975) (government bears "heavy burden of overcoming the strong presumption" in favor of judicial review). This presumption of judicial review is overcome by "clear and convincing evidence of a contrary congressional intent." *Bd. of Governors Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). Accordingly, the APA's exception to judicial review is a "very narrow exception," re-

served for "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citation omitted).

The Supreme Court has carved out certain categories of agency action that are exempt from judicial review under the APA because they are committed to agency discretion. "Over the years, we have read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.' " *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993). Categories of actions committed to agency discretion include: (1) agency decisions to institute enforcement proceedings; (2) an agency's refusal to grant reconsideration of an action; (3) a decision by the CIA to terminate an employee in the interests of national security; and (4) an agency's allocation of funds from a lump-sum appropriation. *Id.* at 191–92, 113 S.Ct. 2024 (citations omitted). In *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Court stated that the "committed to agency discretion" exception to APA judicial review applies where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830, 105 S.Ct. 1649. "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.' " *Id.*

---

7. Because the Court finds that CAIR has standing to bring these claims, there is no need to address whether AILA also has standing. "[I]f constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise th[ose] claim[s]." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C.Cir.1996).

The Department maintains that the INA does not set forth any manageable standards for reviewing the Attorney General's discretion in organizing the Board or establishing its internal procedures and case management priorities. But while the INA alone may not provide sufficient "judicially manageable standards" for review of the Department's action, earlier regulations do provide some standards by which the Court may review the final regulation. In the absence of clear congressional intent to preclude review, judicial review is available to hold an agency to the procedural and substantive standards contained in its own regulations governing administrative action, even where the statute grants the agency absolute discretion over administrative decisions. *See Center for Auto Safety v. Dole*, 828 F.2d 799, 807 & n. 11 (D.C.Cir.1987). "[E]ven if the underlying statute does not include meaningful (or manageable) standards, 'regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review.'" *Inova Alexandria Hospital*, 244 F.3d at 346 (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 154 (D.C.Cir. 1989)).

The Department's regulations require that "there shall be . . . a Board of Immigration Appeals," 67 Fed.Reg. at 54901; 8 C.F.R. § 1003.1(a)(1), and that the Board must adjudicate immigration appeals in such a manner to provide precedential guidance to the INS, immigration judges, immigrants, and immigration attorneys, 67 Fed.Reg. at 54902; 8 C.F.R. § 1003.1(d)(1). Department regulations also require the Board to adjudicate appeals in a manner that is legally correct, impartial, independent, and timely. 67 Fed.Reg. at 54902; 8 C.F.R. § 1003.1(d)(1). Such standards supply some specificity to the applicable APA standards employed in judicial review of agency regulations. Indeed, it is in part based on these regulations that plaintiffs challenge the Department's decision to reduce Board size and implement a transition period to reduce the Board backlog. But as with many procedural challenges to the promulgation of regulations, familiar APA concepts (*see* pp. 15–16 *infra*) provide the core standards for judicial review.[8]

The Department contends that its regulation reforming Board procedures is simply an allocation of resources that is committed to agency discretion under *Chaney*. There, the Supreme Court noted that a decision to enforce necessarily requires an agency to assess the expenditure of its resources, and therefore is best left to the agency's discretion:

> [T]he agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the

---

8. The Court can apply a judicially manageable standard of review by ensuring, under the APA, that the Department has provided a sufficiently reasoned decision to reform the appeals process and to fulfill the requirements of providing an independent, timely, and impartial adjudication of appeals. "As noted by the Circuit Court, 'courts have a clear role to play in ensuring that an agency's practical implementation of its program is consistent with its own declared intentions and goals. Courts often have invalidated agency action because it simply did not comport with standards of rational decisionmaking given the agency's uncontested goal." *Beverly Health & Rehab. Services v. Thompson*, 223 F.Supp.2d 73, 90 (D.D.C.2002) (quoting *Robbins v. Reagan*, 780 F.2d 37, 46 (D.C.Cir. 1985)).

agency has enough resources to undertake the action at all.

*Chaney*, 470 U.S. at 831, 105 S.Ct. 1649. Thus, the allocation of resources consideration was noted in connection with the decision whether to undertake a specific agency enforcement action. The Court does not read *Chaney* as providing a blanket exception to APA review in any matter involving the allocation of agency resources, wholly separate from an agency's enforcement decision. Here, plaintiffs do not challenge any individual decision or agency enforcement action.[9] Rather, the challenged regulation deals with the general procedures for adjudicating immigration appeals.[10] Moreover, "there is no steadfast rule of unreviewability in the immigration context." *Socop–Gonzalez v. INS*, 208 F.3d 838, 845 (9th Cir.2000). "Unless jurisdiction is withdrawn from the federal courts by statute, we have traditionally reviewed most agency decisions in immigration cases, including those committed to the executive branch's discretion." *Id.* at 845–46

The Department promulgated its regulation through a notice-and-comment rulemaking and published it in the Code of Federal Regulations (CFRs). The fact that the Department proceeded through such rulemaking suggests that the regulatory provisions are not merely procedural, but substantive "rules that have the force and effect of law." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1109 (D.C.Cir.1993)

(finding rules published in Code of Federal Regulations are substantive law); *see also Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 96 n. 8 (D.C.Cir.1997) (characterizing an agency "regulation that had been adopted by notice and comment rulemaking" as "substantive"). Hence, the Court rejects the Department's claim that the challenged regulation is merely an internal, procedural rule. The regulation here is, in some respects, similar to the procedures (promulgated through notice-and-comment) for the adjudication and appeals process for black lung benefits which the D.C. Circuit recently reviewed under the APA. *See Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849 (D.C.Cir.2002); *see also Disabled Am. Veterans v. Gober*, 234 F.3d 682 (Fed.Cir.2000) (reviewing under APA rules of practice for the Department of Veterans Affairs' Board of Veterans' Appeals). There, the Court noted that "the Secretary of Labor has chosen, ... to gain all of the law-declaring attributes of an APA notice-and-comment rulemaking." *Id.* at 858. The D.C. Circuit rejected the claim that the regulations were simply internal, procedural rules. "The new regulation thus changes the legal landscape by precluding adjudicators from considering unrelated medical disabilities .... It cannot be said to be merely 'procedural,' because it has a direct effect on the determination of liability." *Id.* at 864.

The Court concludes that the Department has not met its burden of demon-

---

9. *See New York State Dep't of Law v. FCC*, 984 F.2d 1209, 1216 (D.C.Cir.1993) ("Such agency enforcement decisions, which often turn on careful calculations about finite resource allocation, are ill-suited to judicial oversight."); *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 423 (D.C.Cir.1992) (citing *Chaney* for the proposition that "courts generally lack authority to review agency's enforcement agenda and resource-allocation decisions").

10. The Eighth Circuit has rejected an argument that Department of Agriculture meat and poultry processing regulations were nonreviewable because "the Secretary has merely made a decision to use agency resources to enforce the meat inspection processing regulations." *Kenney v. Glickman*, 96 F.3d 1118, 1122 (8th Cir.1996) ("We reject appellee's characterization of the zero tolerance and water washing policies as enforcement decisions,"; "[t]he Secretary's decisions ... are not *Chaney*-type enforcement actions.").

strating that Congress intended to deny judicial review of the notice-and-comment promulgation of the final regulation. The Department has simply not overcome the strong presumption of judicial review.

## IV. PLAINTIFFS' CHALLENGE TO THE FINAL RULE

Plaintiffs contend that three aspects of the final rule are arbitrary and capricious and not the result of reasoned decision-making: 1) the decision to adopt the streamlining provision as the dominant method of adjudication; 2) the provision reducing the size of the Board from 23 members to 11; and 3) the six-month transition period designed to reduce the Board's backlog.[11] The Court addresses each challenge in turn.

### A. Standard of Review

The APA requires a court to set aside agency action that is arbitrary or capricious. "[T]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43, 103 S.Ct. 2856. Agency action "is entitled to a presumption of regularity, [but] that presumption is not to shield [such] action from a thorough, probing, in-depth review." *Citi-*

*zens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814. The Supreme Court has explained a court's duty to review agency action under the APA:

> In reviewing [the agency] explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies. We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*State Farm,* 463 U.S. at 43, 103 S.Ct. 2856; *see also Allentown Mack Sales & Service, Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) ("the process by which [an agency] reaches that result must be logical and rational").

"The key to the arbitrary and capricious standard is its requirement of reasoned decision making." *United States Info. Agency v. FLRA,* 960 F.2d 165, 169 (D.C.Cir.1992). The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result, *see FEC v. Rose,* 806 F.2d 1081, 1088 (D.C.Cir. 1986), and respond to "relevant" and "sig-

---

11. Because the Court upholds the regulations, it need not address plaintiffs' attack on the three 2002 internal memoranda on streamlining. *See infra* p. 31 n. 14.

nificant" public comments. *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35–36 & n. 58 (D.C.Cir.1977). However, "neither requirement is particularly demanding." *Public Citizen, Inc. v. FAA,* 988 F.2d 186, 197 (D.C.Cir.1993).

## B. Streamlining

■ Plaintiffs allege that DOJ failed adequately to explain its decision to resolve most Board cases through the single-member review and summary affirmance process required by streamlining. The regulation makes review by a single-Board member "the dominant method of adjudication for the large majority of cases before the Board." 67 Fed.Reg. at 54879. Plaintiffs assert five reasons why the decision to expand streamlining was arbitrary and capricious: 1) the decision allegedly ignored DOJ's 1999 finding that single-member review should not be the dominant method of case disposition; 2) DOJ ignored adverse evidence in the Arthur Anderson study; 3) the decision relied on faulty statistics; 4) DOJ improperly relied on anecdotal evidence; and 5) DOJ inexplicably increased the discretion of single Board members. The Court finds that defendants have articulated a satisfactory explanation for the decision to adopt streamlining as the dominant method of adjudication, and concludes that there is a "rational connection between the facts found and the choice made." *See State Farm,* 463 U.S. at 43, 103 S.Ct. 2856.

In support of its decision to expand the streamlining initiative to most cases before the Board, DOJ relied primarily on three things: Arthur Anderson's favorable audit of the streamlining initiative, Congressional testimony reflecting a continued need for Board reform, and the Department's own internal statistics and assessment. Although not altogether free from doubt,

these factors tend to support DOJ's decision.

Plaintiffs argue that the Department simply ignored without explanation its 1999 decision rejecting a suggestion to establish streamlining as the dominant method of adjudication. "[A]n agency is free to alter its past rulings and practices," but it "must provide a reasoned explanation for any failure to adhere to its own precedents." *Airmark Corp. v. FAA,* 758 F.2d 685, 691–92 (D.C.Cir.1985). In the 1999 streamlining regulation, DOJ noted that "a move to single-Member adjudication of nearly all cases would make it more difficult to maintain the consistency of adjudication that the Board attempts to provide." 64 Fed.Reg. at 56139. Yet, after two years of positive experience with streamlining, as well as a very favorable external audit of the streamlining initiative, the Board concluded that streamlining's success warrants an expansion of the streamlining procedure:

> The Department agrees with the fundamental assessment that the Board's use of the streamlining process has been successful, and, in this rule, expands the single-member process to be the dominant method of adjudication for the large majority of cases before the Board.

67 Fed.Reg. at 54879.

Notably, in 1999 the Department had merely passed on moving toward single-member review of most cases "at this time." 67 Fed.Reg. at 56139. In now deciding to expand streamlining, the Department has concluded that by allowing individual Board members to issue brief orders through the streamlining process, more cases can be decided. Indeed, the Department found that 58 percent of new appeals in 2001 were summarily decided by a single Board member—in other words, the Board was already deciding

most cases through the streamlining initiative. 67 Fed.Reg. at 54879. "That initiative, allowing certain categories of appeals to be adjudicated by a single member, was recently assessed favorably by an external auditor," the Department further explained. *Id.* The Department also "concluded that streamlining has proven to be an effective procedure for managing an ever-increasing caseload and will significantly assist and promote fair and expeditious review of all pending and incoming appeals while maintaining a respondent's rights to a reasoned administrative decision." *Id.* at 54885. The Department did not ignore its 1999 decision to limit streamlining; it simply found that given the Arthur Anderson audit and substantial progress with streamlining since 1999, it was time to expand it. "The Department believes that the Board's experience with the streamlining initiative has proven that fears of procedural failures or substantive errors being overlooked are not well founded." *Id.* The Department thus has provided "a reasoned analysis that the prior policies and standards are being deliberately changed, not casually ignored." *Airmark Corp.*, 758 F.2d at 692 (agency may be "tolerably terse" in explaining change of course, but it cannot be "intolerably mute").

Plaintiffs also contend that DOJ ignored its own 1999 finding that streamlining most appeals would adversely affect the consistency of Board decisions. "[A] move to single-Member adjudication of nearly all cases," the Department explained in 1999, "would make it more difficult to maintain the consistency of adjudication that the Board attempts to provide." 64 Fed.Reg. at 56139. The Department acknowledged and agreed that this concern was "relevant"—"any tribunal must be concerned with whether its members are adjudicating factually and legally similar claims in a similar fashion." 67 Fed.Reg. at 54887.

Hence, the Department did not "'ignore its own prior findings'" about the perceived effects of streamlining on the coherence and uniformity of its decisions. "An agency's change of course with respect to a particular policy does not in itself suggest a lack of reasoned decisionmaking." *Natural Res. Def. Council v. EPA,* 822 F.2d 104, 112 (D.C.Cir.1987). Rather, DOJ explicitly recognized in 1999 that it had "carefully considered the option of moving to a single-Member review of most cases, but has decided not to adopt that option at this time"—thereby leaving open the possibility of revisiting the decision in the future. 64 Fed.Reg. at 56139 (emphasis added).

Indeed, by December 13, 2001, the streamlining initiative had been deemed an "unqualified success" by Arthur Anderson. Most of those surveyed found that the streamlining project had improved BIA productivity, and only a small percentage of EOIR staff members surveyed disagreed that streamlining produced fair and legally correct results. A.R. 553, 528. Moreover, in adopting the streamlining rule for most cases, the Department noted that permitting single-Member review would "allow[ ] more resources to be allocated to the resolution of those cases that present difficult or controversial legal questions—cases that are most appropriate for searching appellate review and that may be appropriate for the issuance of precedent decisions." 67 Fed.Reg. at 54880. As the Department explained:

> Where single Board members can resolve such appeals through issuance of a brief written opinion, the Board will be able to concentrate greater resources on the more complex cases that are appropriate for review by a three-member panel, and will also be able to focus greater attention on the issuance of precedent decisions that provide guidance

to the immigration judges, the [INS], attorneys, and accredited representatives, and respondents.

*Id.* at 54879. With additional time and resources to focus on the more complex cases, and with the understanding that most appeals would be resolved by summary affirmance, streamlining would put the Board in a better position to maintain cohesiveness and uniformity for its most important and complex decisions. Certainly, it is not irrational for the Department to come to that conclusion in 2002 with the benefit of several years of streamlining experience.

Importantly, while the Department was concerned in 1999 that streamlining could affect the collegiality and uniformity of decisions, by 2002 the rapid Board expansion was being suggested as the actual cause of such problems. At a hearing before the House Subcommittee on Immigration on February 6, 2002, longtime Board member Michael Heilman testified, in depth, that problems of cohesiveness, collegiality, and uniformity were the result of rapid Board expansion. A.R. 875. Hence, in expanding streamlining later in 2002, DOJ explained that "the continued expansion of the Board has, indeed, had significant institutional costs including effects on the cohesiveness and collegiality of the Board's decision making process, and the Department's perception of the uniformity of its decisions." 67 Fed.Reg. at 54894. DOJ thus had the benefit of observing streamlining in effect for more than two years, and reconsidered on that basis the concerns it had voiced in 1999. Agencies must be allowed to reconsider positions in the event of changed circumstances or new information. *See, e.g., State Farm,* 463 U.S. at 57, 103 S.Ct. 2856 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances."); *Nat'l Family Planning and Reprod. Health As-*

*soc. v. Sullivan,* 979 F.2d 227, 230–31 (D.C.Cir.1992) ("An agency, in light of changing circumstances, is free to alter the interpretative and policy views reflected in regulations construing an underlying statute.").

Plaintiffs also claim that in relying on the Arthur Anderson audit as one basis for expanding streamlining, DOJ ignored adverse evidence in the Arthur Anderson assessment. But the Department did not cherry-pick parts of the Arthur Anderson study; instead, it relied on the study's two overall conclusions. "The overwhelming weight of both 'objective' and 'subjective' evidence gathered during the conduct of this study indicates that the Streamlining Pilot Project has been an unqualified success," A.R. 539, and "[s]urvey results indicated that the Streamlining Pilot Project has not adversely affected the quality of decisions rendered," A.R. 528, the study found. Indeed, during the notice and comment period, no commenter questioned the Department's reliance on the Arthur Anderson study. Although there were survey responses from staff members with unfavorable comments about streamlining, they were limited and minor, and did not undermine Arthur Anderson's ultimate conclusions on which the Department relied. Of course, an agency may reasonably rely on a study even if that study is not unanimously favorable. *See State Farm,* 463 U.S. at 53, 103 S.Ct. 2856 (allowing agencies to rely on their expertise in drawing conclusions from studies).

DOJ acknowledged, moreover, the limitations of the study, and the absence of completely objective data. "Streamlining has not been implemented long enough to provide a sufficient amount of historical data to provide an 'objective' evaluation of its effect upon the quality of decisions rendered." A.R. 550. Given the over-

whelming size of the Board's backlog and the Board's ever-increasing caseload, however, the Department did not have time for a more extensive study:

> Although a complex study of the results of streamlining, by following a specific set of streamlined cases through judicial review, has been proposed, such a theoretically "objective" evaluation could take years. The Department may or may not undertake such a study, but the demands for fair, effective, and efficient adjudication of present cases do not permit the luxury of waiting for the results of such a study.

67 Fed.Reg. at 54885. Despite the study's acknowledged limitations, then, it was nevertheless reasonable for the Department to rely on it in deciding to extend streamlining to most Board cases. Arthur Anderson conducted individual staff surveys and found that 91 percent of informed staffers agreed that streamlining increased resolution of cases, with only 6 percent of responding staffers believing that streamlining did not produce fair and legally correct results. A.R. 575.[12] In fact, Arthur Anderson found that the "quality of decisions rendered by the Streamlining Panel has been equal to that currently experienced by the other Board panels." A.R. 544. The Court therefore rejects plaintiffs' claim that the Department ignored adverse evidence in the Arthur Anderson assessment, and finds that it was reasonable for the Department to rely on the favorable conclusions in the Arthur Anderson study.

Similarly, plaintiffs go to some lengths to challenge DOJ's reliance on a statistic arguably showing that few streamlined cases have been reversed or remanded on appeal:

> Summary affirmances have not yet resulted in an overwhelming number of remands from Federal district and appeals courts. Of the 23,224 streamlined decisions between 1999 and 2001, only 0.7% have resulted in judicial remands or reversals.

67 Fed.Reg. at 54885. Plaintiffs challenge that calculation as "profoundly flawed," and the Court agrees that the statistic is somewhat misleading. There is no dispute that from fiscal year 1999 to fiscal year 2001, federal courts remanded or reversed only 168 cases that had been streamlined. A.R. 676. But it is the use of the total number of streamlined cases decided by the Board over the same period (23,224)— the denominator in the Department's calculation—that is potentially misleading. That is not the number of streamlined cases actually appealed (the number Arthur Anderson recommends using to obtain an accurate view of the rate of reversal). If all 23,224 cases had been appealed,

---

**12.** Plaintiffs maintain that it is "astonishing" that only 60 percent of the Board staff who were surveyed agreed that streamlining produced correct decisions. A.R. 575. In fact, the survey found that 61 percent agreed that streamlining produced fair and legally correct decisions, while 6 percent disagreed—and 33 percent were neutral. *Id.* Arthur Anderson explained that "the large number of 'neutral' responses were provided by non-Streamlining associated staff members." *Id.* Arguably, if they were not involved in streamlining, they may not have been able to assess whether streamlining resulted in fair and legally correct decisions. But it is misleading for plaintiffs to maintain that "almost 40% of BIA staff surveyed were unwilling or unable to agree that streamlining produced fair and legally correct results." Indeed, the survey found that only 6 percent, a small minority, disagreed that streamlining produced such results. If the 33 percent "neutral" responses are excluded, then over 91 percent (61 of 67) of informed staff members agreed that streamlining produced fair, legally correct decisions. As the Arthur Anderson study found, "the survey results in collaboration with the interview observations indicated that Streamlining produces fair and legally correct decisions." A.R. 575.

the 0.7 percent reversal rate would indeed be impressive. Such is not the case, however. Indeed, as plaintiffs note, many streamlined decisions cannot be challenged in court, and even when review is allowed, the legal threshold for reversing or remanding an immigration appeal is high, and courts employ a deferential standard of review. Reversal figures, plaintiffs contend, would be low in part because streamlined cases, by their nature, consist of non-controversial issues and are thus unlikely to be overturned. Significantly, as plaintiffs correctly point out, given the slow pace of judicial review, it is not likely that there was a significant body of judicial rulings on streamlined cases by the end of September 2001. Thus, the Court finds the Department's 0.7 percent reversal rate to be an unreliable basis for expanding the streamlining initiative to most Board cases.

However, DOJ's adoption of the streamlining rule did not hinge in large part on the precision of the reversal rate, but rather on the broader point that "[s]ummary affirmances have not yet resulted in an overwhelming number of remands from Federal district and appeals courts." 67 Fed.Reg. at 54885. Indeed, it is significant that in two years of streamlining cases, there have only been 168 reversals or remands of streamlined cases. "Although this is not the full study envisioned by the Streamlining Report," DOJ reasoned, "it is, together with anecdotal evidence, sufficient evidence for the Department to proceed with an expansion of the single-member review process. The Department has concluded that streamlining has proven to be an effective procedure for managing an ever-increasing caseload." *Id.* Hence, although it may take some time to determine a more accurate reversal rate, it is nonetheless true at this time that there have been relatively few reversals of streamlined cases, a fact generally supportive of expanding streamlining. Indeed, this comports with the results, albeit also limited, of staff surveys Arthur Anderson conducted about the legal accuracy of streamlined cases. *See id.* As the Supreme Court has noted, "[i]t is not infrequent that the available data does not settle a regulatory issue and the agency must exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *State Farm,* 463 U.S. at 52, 103 S.Ct. 2856. In short, the Court finds that the Department's reliance on the limited number of reversals and remands of streamlined cases reasonably supports the Department's decision to expand streamlining, even if the 0.7 percent reversal rate itself is of limited value.

Plaintiffs also challenge the Department's reliance on "anecdotal evidence" to support expansion of the streamlining initiative. Plaintiffs concede that an agency may rely on anecdotal evidence as a basis for agency action. *See* Pl. Motion for S.J. at 42; *see also Christian Broadcasting Network v. Copyright Royalty Tribunal,* 720 F.2d 1295, 1306 (D.C.Cir.1983) ("anecdotal evidence" was adequate to explain agency's action). The anecdotal evidence on which the Department relied was that "[t]he Streamlining Study has not noted an appreciable difference in the quality of the decisionmaking based on the experience of the participants." 67 Fed.Reg. at 54885. Likewise, the Department agreed with the observations made by former Board member Michael Heilman in his congressional testimony on February 6, 2002, in support of broad reform of the Board. Although Board member Sarah Rosenberg felt that immigration judges or Board members did not fully consider the factual records in many immigration cases, the Department plainly disagreed, finding that the "overwhelming percentage of immigration judges decisions ... are legally and factu-

ally correct." *Id.* at 54880. That conclusion mirrored Heilman's experience as a long-serving Board member. "I reviewed over 100,000 appeals over a 15–year period at the BIA," Heilman told the House Subcommittee. "I would state without hesitation that the overwhelming percentage of Immigration Judge decisions that I reviewed were legally and factually correct." A.R. 874. Assessing the accuracy and legal correctness of immigration rulings is distinctly within the Department's expertise, and it is not precluded from relying on this expertise to determine whether to expand streamlining. The Department thus reasonably concluded that streamlining could be extended to most cases without sacrificing the legal and factual accuracy of rulings.[13]

Hence, DOJ's decision to expand the streamlining procedure to most Board cases is supported "by substantial evidence." *Nat'l Mining Assoc. v. Dep't of Labor,* 292 F.3d 849, 868 (D.C.Cir.2002). The Court therefore finds that the Department has made a reasoned decision in adopting the expanded streamlining regulation, and that its decision was not arbitrary or capricious.[14]

## C. Board Size Reduction

█ Plaintiffs assert that the Department breached its duty of reasoned decision-making when it decided to reduce the Board's size from 23 authorized members to 11, reversing consistent prior Board expansion. Plaintiffs maintain that the Department's rationale for Board reduction is conclusory and disregarded concerns that Board reduction, without defined standards for removing Board members, could compromise the independence and impartiality of Board members.

Plaintiffs correctly note that over the last eight years the Department has repeatedly found that the increasing Board caseload warranted adding more Board members and staff. In fact, DOJ increased the Board from 5 members to 9 members in 1994, to 12 members in 1995, to 15 members in 1996, to 18 members in 1998, and to 21 members in 2000. The Department explained each Board expansion as necessary to maintain "an effective, efficient system of appellate jurisdiction."[15] Most recently, the Attorney General has again expressly endorsed Board

---

**13.** Plaintiffs' assertion that they have evidence, obtained through FOIA requests, that one in six asylum cases is reversed or remanded, does not undermine the Department's view that immigration decisions are overwhelmingly factually and legally correct. To begin with, this purported information obtained through FOIA is not in the administrative record before the Court and hence should not be considered in this APA review case. *See Florida Power & Light v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Even if the Court considered this evidence, a reversal rate of roughly 17 percent (one in six) in one discrete category of cases does not place in doubt the Department's view that most decisions in cases in all categories are legally and factually correct.

**14.** Because the Court upholds the final streamlining regulation, plaintiffs' challenge

to the three memoranda issued by acting Board chairman Scialabba (dated March 15, 2002, April 18, 2002, and May 3, 2002) is now moot. *See* Compl. at ¶¶ 41–46. The final streamlining regulation, which became effective September 26, 2002, amends and thus supercedes the 1999 streamlining regulation codified at 8 C.F.R. § 1003.1(a)(7)(i)-(ii) (1999), pursuant to which the acting chairman issued the three memoranda. The 1999 regulation, and the memoranda issued pursuant thereto, thus no longer have any legal effect, and plaintiffs' APA challenge to the memoranda is moot.

**15.** *See, e.g.,* 59 Fed.Reg. 47231 (Sept. 15, 1994); 60 Fed.Reg. 29469 (June 5, 1995); 61 Fed.Reg. 59305 (Nov. 22, 1996); 63 Fed.Reg. 51518 (Sept. 28, 1998); 65 Fed.Reg. 20068 (Apr. 14, 2000).

expansion. On September 12, 2001, the Department authorized expansion of the Board to 23 members "in order to maintain an effective, efficient system of appellate adjudication in the face of the Board's increasing caseload," 66 Fed.Reg. 47379 (Sept. 12, 2001), and on December 3, 2001, Attorney General Ashcroft increased the Board size to 23 members. 66 Fed.Reg. 61788 (Dec. 3, 2001). Although the Attorney General thus has had the authority to appoint additional Board members, the positions were not filled.

■ "An administrative agency is not disqualified from changing its mind." *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Three months after endorsing Board expansion, the Department proposed to reduce Board size to 11 members. Plaintiffs contend that the Department did not adequately explain the departure from its expansion practice over the last eight years. However, the Department has concluded, with reason, that despite repeated Board expansion, the case backlog was increasing, not decreasing. 67 Fed.Reg. at 54894. Moreover, since the most recent Board expansion, two important intervening events occurred that convinced the Department to adopt a revised policy of Board reduction: Arthur Anderson's favorable audit of the 1999 streamlining project and the February 6, 2002, hearing on immigration reform before the House Subcommittee on Immigration.

The Arthur Anderson assessment was not released until December 13, 2001. *See* 67 Fed.Reg. at 54879. The audit concluded that "the overwhelming weight of both 'objective' and 'subjective' evidence gathered during the conduct of this study indicates that the streamlining project has been an unqualified success." A.R. 539. After the study was released, the option of expanding streamlining, rather than ex-

panding the Board, became a viable option for addressing the Board's mounting caseload. Then, on February 6, 2002, the House Subcommittee on Immigration held a hearing on EOIR operations. *See* A.R. 857–915. Two former Board members testified that, based on their experience, the size of the Board should be reduced. The Department observed "that two individuals who understand the Board well from their previous experience as Board members, and who testified before the House Judiciary Subcommittee, both agreed that the size of the Board should be reduced but differed over the proper reduction—one arguing for a reduction to no more than 9 while the other suggested 16." 67 Fed. Reg. at 54893.

The Department therefore decided to expand streamlining to most Board cases, which it concluded would reduce the Board backlog, in turn eliminating the need for a larger Board size:

A number of commenters expressed the view that the current case backlog reflects the need for more resources. In their view, increased attorney and paralegal staffing, as well as filling all existing Board member positions, would be a preferable method of reducing the backlog.... [B]eginning in 1995, the Department sought to aid the Board in reducing its burgeoning caseload by increasing its size from 5 to 23 Board members with increases in its attorney and support staff. **It is now evident that the Board does not face a "personnel-budget" problem but rather a fundamental systemic problem.** The continued expansion of the Board has not effectively reduced the existing case backlog. The one element that has begun to help reduce the backlog—streamlining—is being expanded through this rule. By expanding the number of cases that can be resolved

either through a summary affirmance without opinion, or by a short written order by a single Board member, this process will substantially free up the staff resources of the Board to focus on backlog reduction.

*Id.* at 54894 (emphasis added). Contrary to plaintiffs' view, then, the Department acknowledged its earlier policy of Board expansion, and then explained why that policy was no longer appropriate.

The context and timing of the decision adopting Board reduction justified the Department's departure from its former practice of Board expansion. *See, e.g., American Petroleum Institute v. EPA,* 216 F.3d 50, 60–61 (D.C.Cir.2000) ("In context, ... we believe we may discern the Agency's path to its conclusion" justifying its ruling.). Simply put, in the interval between the Department's most recent support of Board expansion and its adoption of Board reduction, two important events transpired which served as a basis for the Department's decision to abandon its prior Board expansion policy—the Arthur Anderson study's conclusion that the streamlining initiative was an unqualified success and congressional testimony recommending Board reduction. Moreover, the Department had the benefit of its positive experience with streamlining. "Experience is often the best teacher, and agencies retain a substantial measure of freedom to refine, reformulate, and even reverse their precedents in the light of new insights and changed circumstances." *Davila–Bardales v. INS,* 27 F.3d 1, 5 (1st Cir.1994);

*see also Miami Nation of Indians of Indiana v. Dep't of Interior,* 255 F.3d 342, 348–49 (7th Cir.2001) ("[T]he requirement of reasoned decision making ... implies that an agency may not deviate from its regulations without a reason .... A rational person acts consistently, and therefore changes course only if something has changed."). Thus, the Department has established a reasonable basis for its change of policy.

Plaintiffs also argue that the Department failed to consider suggestions to resolve the backlog of Board cases by simply filling the Board vacancies. The Department certainly considered that option—but it had repeatedly attempted to resolve the backlog by increasing the number of Board members, without tangible results. Filling vacancies is just a means of Board expansion, which, in the Department's experience, has not worked. *See* 67 Fed. Reg. at 54894 ("The continued expansion of the Board has not effectively reduced the existing case backlog."). Again, the Department has addressed, but rejected, plaintiffs' suggestion, and sufficiently explained its decision not to fill the four vacancies through its conclusion that Board expansion, however achieved, had not worked to resolve the backlog of pending appeals.[16]

Plaintiffs assert that the Department's justification for downsizing was "completely conclusory" and fails to explain the decision in sufficient detail. The D.C. Circuit has observed that " '[s]tating that a factor was considered ... is not a substitute for

---

16. Plaintiffs colorfully argue that, given the large case backlog, "downsizing the Board now is tantamount to saying that the way to reduce traffic on Interstate 95 is to eliminate two lanes of the four-lane highway each way." Pl. Mot. for S.J. at 49. However, the Board reduction was set to occur by March 25, 2003, or "at such other time as may be specified by the Attorney General." 8 C.F.R.

§ 1003.1(a)(1). Thus, the Board reduction would occur in connection with resolution of the Board's backlog following the six-month transition period—i.e., Board reduction was not to occur until after a sizeable portion of the backlog of pending cases had been resolved. In this light, the Department's decision to reduce Board size was not unreasonable.

considering it.' " *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 499 (D.C.Cir.1988) (quoting *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir.1986)). The Department determined to downsize the Board, in part, "based on judgments [it] made" about three issues: the "historic capacity of appellate courts and administrative appellate bodies to adjudicate the law in a cohesive manner, the ability of individuals to reach consensus on legal issues, and the requirements of the existing and projected caseload." 67 Fed.Reg. at 54893. Plaintiffs question these "judgments."

The Department's explanation was not conclusory, but rather cited evidence in the record to explain the decision to reduce the Board size. Expansion, for example, was found to undermine the Board's effectiveness:

> [C]ontinued expansion of the Board has, indeed, had significant institutional costs including effects on the cohesiveness and collegiality of the Board's decision making process, and the Department's perception of the uniformity of its decisions, and an administrative and supervisory strain on the Board's staff.

67 Fed.Reg. at 54894 (citing Commission on Revision of the Federal Court Appellate System, Structure and Internal Procedures: Recommendations for Change (1975)).

The Department also cited the testimony of Michael Heilman, the former Board member who testified before a House Subcommittee and concluded that "continued expansion has shifted the Board's attention away from providing nationwide guidance on those cases presenting difficult and repetitive or controversial legal questions." *Id.* It was reasonable for the Department to rely on Heilman's testimony.[17] Based on his extensive experience as a member of the Board, Heilman was convinced that the Board had grown too large. "I think that it's clear at this point that the Board of Immigration Appeals has too many members.... I propose [ ] 9 members. I think that's too many; probably 11 is too many." A.R. 872.

Heilman explained at length how the ever-increasing size of the Board resulted in fractious and contradictory decisions, which affected the Board's ability to provide clear guidance and precedent:

> It was inevitable that the ability of the BIA to issue precedent decisions, to say nothing of useful precedent decisions, would be lowered as the number of Board Members increased.... The BIA also came to be marked by internal divisions based on personality conflicts. The tone and language used in BIA decisions began to display the differences among the Members and display a coarseness of spirit. This change in the content of the precedent decisions was also evident in panel decisions and internal divisions within panels mirrored those found at the BIA as a whole.... The number of Members was also continuously being increased during this time, and so issues apparently resolved one month had a way of becoming unresolved as new votes and new voting patterns appeared.... This state of affairs also affected the BIA internally, as staff attorneys had difficulty deciphering the BIA's own majority position on any giv-

---

**17.** Heilman has had far more experience— nearly three decades with the BIA, INS, and Department of Justice—than any other person who testified before the House Subcommittee on Immigration. A.R. 872. Appointed to the Board in 1986, Heilman reviewed over 100,- 000 appeals over a 15–year period before retiring from the Board in 2001. A.R. 870– 75. Before that, he worked for the Department of Justice as an attorney at the Board, and then became Associate General Counsel at the INS. A.R. 865.

en subject. BIA panels more and more often issued decisions that varied widely in interpretation of the laws and outcome, as well as decisions that showed different views of the BIA role as an appellate body. A.R. 875–76. Heilman warned that "approaching this situation as if a large caseload of appeals is a given and that the only way to deal with it is to appoint yet more BIA Members and staff attorneys, will insure that the system as presently constituted will ultimately collapse of its own weight." A.R. 876. The Department agreed, finding that "the Board's precedent decisions indicate an inability to reach consensus about even fundamental approaches to the law." 67 Fed.Reg. at 54894. The Department also agreed "with certain comments that the reduction in the number of Board members should increase the coherence of Board decisions and facilitate the en banc process, thereby improving the value of Board precedents." *Id.* The Department's decision to reduce Board size is therefore substantially supported by Heilman's testimony and long experience on the Board.[18]

Plaintiffs also challenge selective reliance by the Department on various studies analyzing federal appellate courts. The Department noted that the "institutional cost of unlimited expansion is not a new phenomenon, but one that has been experienced in the federal court system." 67 Fed.Reg. at 54894 (citing B. White, et al., Commission on Structural Alternatives for the Federal Courts of Appeals: Final Report, 29–57 (1998)). For example, the Department relied on the White Commission's study as support that appellate courts and panels should ideally have between 11 and 17 members. At the same time, plaintiffs allege, these studies of court systems have never concluded that summary affirmance or single-person appellate review are appropriate methods of adjudication for federal courts. To be sure, although administrative appeal panels are similar to federal appellate courts in some ways, they differ in a number of other critical ways. But merely because an agency relies on a study for one proposition does not necessarily require the agency to adopt or distinguish all of the study's conclusions. *See State Farm,* 463 U.S. at 53, 103 S.Ct. 2856 ("We believe that it is within the agency's discretion to pass upon the generalizability of field studies."). In comparing administrative panels with appellate courts, it is clear that not all findings in studies of judicial appellate structures will translate equally to administrative structures.[19] Nonetheless, the Department could, based on its experience

---

**18.** The Department observed that both Heilman and Lauren Mathon, also a Board member, "agreed that the size of the Board should be reduced but differed over the proper reduction—one arguing for a reduction to no more than 9 while the other suggested 16." 67 Fed.Reg. at 54893. The Department's final decision arrived at a middle ground between these two suggestions by setting the final Board size at 11. *See, e.g., Allentown Mack Sales & Service,* 522 U.S. at 366, 118 S.Ct. 818 (Scalia, J.) (under arbitrary and capricious standard, "surely it is not irrational for [an agency] to split the difference"); *Association of American Publishers, Inc. v. Governors of the USPS,* 485 F.2d 768, 773 (D.C.Cir.1973) (upholding under APA Postal Rate Commission recommendation where Commission "split the difference" between two methods presented in the record).

**19.** For example, although one federal court study found that summary affirmances reduce confidence in the courts by creating an appearance of potentially arbitrary action, that conclusion does not necessarily undermine the Department's decision to shift most cases to streamlined decision-making. As streamlining and summary affirmances help reduce the backlog of Board cases, this should actually increase the public's confidence in the system.

with the BIA, rely on comparisons it thought appropriate *See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council,* 435 U.S. 519, 525, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("[A]dministrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts ... to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved."). Thus, it was not unreasonable for the Department to rely on certain observations in federal court studies without adopting or distinguishing all of the findings and conclusions of those studies.

In sum, the Department reasonably concluded that Board reduction was appropriate based on the requirements of the existing and projected caseload, particularly in light of the impact of expanded streamlining:

> [T]he Department believes that following implementation of the streamlining process and this rule, maintaining the current number of Board members will be unnecessary. With greater efficiency, fewer Board members will be needed to adjudicate the caseload. A reduction to 11 Board members will allow for the most efficient use of resources to adjudicate administrative appeals on a timely basis.

67 Fed.Reg. at 54894 n. 11. Of course, should the number of appeals increase unexpectedly, or if the backlog is not cleared, the Department has specifically stated that it "may reevaluate the staffing requirements of the Board in light of changing caseloads and legal requirements following implementation of the final rule." *Id.* at 54893. Such flexibility, in light of a fluctuating caseload and ever-evolving immigration laws, reflects reasoned decision-making. Despite plaintiffs' claims to the contrary, then, in deciding to reduce the Board the Department has "rel[ied] on more than unadorned assertions that it has exercised its expertise on a particular issue." *West Virginia Public Servs. Comm'n v. Dep't of Energy,* 681 F.2d 847, 859 (D.C.Cir.1982). The Court thus finds that the Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," and concludes that there was a "rational connection" between the evidence and reasons cited and the Department's decision to reduce the Board size. *See State Farm,* 463 U.S. at 53, 103 S.Ct. 2856.[20]

20. Plaintiffs also contend that the reduction in Board size, and the lack of standards for determining which members are retained, may force Board members to "audition" to retain their jobs, thereby compromising their independence and impartiality. First, it is not clear that plaintiffs have standing to raise this challenge on behalf of Board members. Second, plaintiffs' concern is speculative, and they have not pointed to anything beyond their conjecture to indicate that Board members will not decide cases fairly and in accordance with Board precedents. Furthermore, DOJ addressed these concerns by pointing out that it "agrees with the principle of independence of adjudicators within the individual adjudications, but notes that freedom to decide cases under the law and regulations should not be confused with managing the caseload and setting standards for review." 67 Fed.Reg. at 54883. DOJ explained that "the Board acts on the Attorney General's behalf rather than as an independent body. The relationship between the Board and the Attorney General thus is analogous to an employee and his superior rather than to the relationship between an administrative agency and a reviewing court." *Id.* (quoting *Matter of Hernandez–Casillas,* 20 I & N Dec. 262, 289 n. 9, 1990 WL 385764 (BIA 1990, A.G. 1991)). Indeed, "[t]he Board is appointed by the Attorney General, serves at his pleasure, and operates under regulations [that provide] that in considering and determining ... appeals, the Board ... shall exercise such discretion and power conferred upon the Attorney General." *United States ex rel. Accardi v.*

## D. The Transition Period

■ Plaintiffs challenge the Department's intent to resolve the outstanding case backlog over a six-month transition period. Comments on the Department's proposal to resolve the backlog raised concerns about hurried rulings and rushed judgments. The Department acknowledged such concerns: "A number of commenters ... argued that the sheer numbers of cases to be decided within that six-month period would reduce the amount of time available for each case, with some commenters offering calculations that this would be reduced to approximately 15 minutes." 67 Fed.Reg. at 54899. However, the Department found this figure unconvincing:

> The Department disagrees with these comments .... Pure mathematical formulas in this area have the beauty of simplicity, but are deceptive. Calculating an average amount of time for a single Board member to decide one case overlooks the differences in cases themselves and the preparatory work that goes into decisions. For example, the Department expects that a clearly untimely appeal can be dispatched promptly by a Board member under the streamlining process. For each such simple case (and the Board's experience streamlining has shown there are many), more time is afforded for considering the issues to which the Board's time should be devoted.

*Id.* Ultimately, the challenge to the six-month transition period fails because its statistical basis is flawed and does not recognize the positive impact streamlining has already had on the case backlog.

The Department justified its decision to implement the transition period in part by emphasizing the overall success of the streamlining initiative. Before the Department proposed the regulation, the Board disposed of cases, on average, at the rate of 2,600 per month in 2001. *Id.* By February 2002, when the Department formally proposed the transition period, the Board's disposal rate had increased to 3,300 dispositions per month. *Id.* And by the time the Department adopted the regulation in August 2002, the average dispositions had risen further: "In recent months, utilizing its authority under streamlining, the Board has increased dispositions to an average of over 5,200 dispositions per month." *Id.* at 54900. The Department explained that "[w]ith the additional authority granted by this final rule, the Department believes that it is reasonable to expect the Board to bring the caseload backlog down to, or near, a current balance within the six-month transition period." *Id.* In light of the impact streamlining already had on the rate of dispositions, the Department's reliance on its continued success was a reasonable basis for adopting a transition period.

Plaintiffs have not disputed the Department's assertion that the Board was disposing of 5,200 cases per month at the time the final regulation was adopted. This figure represents a 63 percent increase in the Board's overall monthly disposition rate—from 3,300 cases in February 2002 to 5,200 in July 2002—over a span of just five months. More importantly, assuming that the Board would continue this high rate of case disposal, many backlogged cases would be resolved by the end of the six-month transition period. The Board Chairman, however, has extended the transition period by an additional 120 days, into June 2003, which should provide ample time, at the Board's current disposal rate, to reduce substantially the Board's backlog of some 56,000

*Shaughnessy,* 347 U.S. 260, 266, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

pending cases, while still enabling the Board to resolve cases filed during this transition period. Accordingly, the Court concludes that the Department has examined the relevant data and articulated a satisfactory explanation for its adoption of a transition period to resolve the Board's backlog of pending cases, including a rational connection between the facts (case disposal rates) and the choice made (adoption of the transition period). *See State Farm*, 463 U.S. at 42, 103 S.Ct. 2856.

CAIR stated in its comments that the Department would be forced to eliminate a backlog of 56,000 cases in just 180 days, in addition to handling half of the 35,000 appeals that are filed each year. A.R. 373. According to CAIR, it used these numbers to arrive at a figure that was divided by the number of working days in six months and the number of Board members. A.R. 374 nn. 23–24. Thus, CAIR deduced that to resolve the backlog in six months, each Board member would have to resolve 32 cases per day, four cases per hour, or one case every 15 minutes. A.R. 374 n. 24.

It was not arbitrary or capricious for the Department to reject this argument. By the time the final regulation was published on August 26, 2002, and became effective on September 25, 2002—more than seven months after the Department initially proposed a transition period for elimination of the backlog—CAIR's calculation had become obsolete. The Department explained that CAIR's calculation was based on a faulty assumption:

[T]he six-month time frame runs from the effective date of the rule, not the date on which it is published in the Federal Register. To say that the Board has not been on notice of this rule also disserves the Board. The Board has been diligently preparing for the implementation of this rule to reduce this backlog of pending cases since the Notice of Proposed Rulemaking was published on February 19, 2002.

67 Fed.Reg. at 54899. Given the expanded streamlining procedures already implemented through internal memoranda, the backlog had been partially addressed before the regulation even took effect, and the Department thus concluded that "[w]ith the additional authority granted by this final rule, ... it is reasonable to expect the Board to bring the caseload backlog down to, or near, a current balance within the six-month transition period." *Id.*[21] Similarly, as the Department explained based on its experience, CAIR's calculation failed to take into account the large number of simple appeals that could be resolved summarily. *Id.* Further undermining CAIR's 15–minute calculation is the authority of the Board Chairman to extend the transition period 120 days, from six months to nine months, *see* 8 C.F.R. § 1003.1(e)(8)(iv), which has now occurred. *See* Hearing Tr. at 90–91 (Feb. 25, 2003). What this all means, as the Department reasonably concluded, is that the 15–minute per case claim that is the centerpiece of plaintiffs' challenge to the transition period is unreliable.[22]

---

21. Notwithstanding plaintiffs' contentions, *see* Pl. Mot. for S.J. at 55–56, the Department did not reject "averages" as deceptive; it simply found CAIR's "mathematical formula" lacking. Indeed, whereas the figures employed in CAIR's calculation are based on questionable assumptions, the Department's monthly disposition rates are undisputed.

22. The final regulation also contains built-in flexibility for resolving the backlog. First, the Department has not insisted on completely eliminating the backlog, which may not be realistic. "[T]he Department believes that it is reasonable to expect the Board to bring the caseload backlog **down to, or near**, a current balance within the six-month transition period." 67 Fed.Reg. at 54900 (emphasis added). Thus, the transition period is not a deadline—

In short, the Court finds that the Department reasonably rejected CAIR's challenge to the six-month transition period. The Department did not ignore plaintiffs' concerns that the Board would be forced to resolve the backlog of cases too quickly. Rather, the Department directly addressed this allegation, and satisfactorily explained why it rejected the plaintiffs' assertion and calculation.[23]

## CONCLUSION

Defendants' reviewability and standing challenges are thus not well-taken, but plaintiffs' challenges to the final regulation are not convincing either. The Court therefore concludes that the Department's final streamlining regulation was not arbitrary or capricious, or otherwise in violation of the law. The Court likewise rejects plaintiffs' APA challenge to the reduction of Board size. Lastly, the six-month transition period for resolving the Board's backlog of cases is not susceptible to the statistical challenge plaintiffs have asserted, and hence was not arbitrary and capricious. The Court therefore denies plaintiffs' motion for summary judgment, denies defendants' motion for dismissal, and grants defendants' motion for summary judgment. A separate order is attached.

---

it is an "aspirational goal." Hearing Tr. at 89 (Feb.25, 2003). Indeed, plaintiffs' counsel conceded that "[t]here's no provision in the regulation itself that dictates that they have to adjudicate all the backlog cases by the end of the period," and agreed that the resolution of the backlog was a goal. *Id.* at 24–25.

**23.** At this point, with the extended transition period close to completion, plaintiffs' challenge is, in any event, really too late. Plaintiffs did not seek preliminary injunctive relief to halt the transition period effort, but rather requested a decision from the Court only by the close of the six-month period.